[No. C007526. Third Dist. May 22, 1991.]

RICHARD W. BJORNESTAD et al., Plaintiffs and Respondents, v.
MARY ANN HULSE, as County Clerk, etc., Defendant;
SIERRA LAKES COUNTY WATER DISTRICT et al., Real Parties
in Interest and Appellants.

COUNSEL

Bartkiewicz, Kronick & Shanahan, Stephen A. Kronick, Alan B. Lily and Paul M. Bartkiewicz for Real Parties in Interest and Appellants.

Himelstein, Savinar, Petrocelli & Curtice, E. Mack Himelstein, Kaus & Kerr, H. Sinclair Kerr, Sonnenschein, Nath & Rosenthal and Michael A. Barnes as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Hoffman, Lien & Faccinto, Hoffman, Lien, Faccinto & Lieberman, Lawrence L. Hoffman, Patricia L. Johnson and Phillip A. Olsen for Plaintiffs and Respondents.

OPINION

DAVIS, J.—

## INTRODUCTION

As originally presented, this case involved federal and state constitutional challenges to Water Code section 30700.6. At that time, the section specified that only landowners in the Sierra Lakes County Water District could vote in district elections or be a member of the district's governing board of directors. As a result of this statute, Sierra residents who did not own land in Sierra were denied any voice in the district affairs that substantially affected them. In a published opinion filed September 5, 1990, we held these landowner-only provisions unconstitutional under the equal protection

guaranties of the federal and state Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)[1]

On September 30, 1990, Assembly Bill No. 3548 (AB 3548) was approved by the Governor. (Stats. 1990, ch. 1652, §§ 1-4.) AB 3548 amended Water Code section 30700.6 (hereafter, section 30700.6) and added section 31015 to that code. The AB 3548 substantive amendment to section 30700.6 provides that "qualified voters at elections for directors or otherwise in the Sierra Lakes County Water District shall be (1) voters who are residents of the district, and (2) every owner of real property within the district, who is not a resident of the district." (Under § 30700.6, only qualified voters can hold office as directors.) The Water Code section added by AB 3548— section 31015—provides: "The Sierra Lakes County Water District shall not exercise any of the [generally applicable county water district] powers and purposes set forth in Article 7 (commencing with Section 31120) [Fire Protection Facilities], Article 8 (commencing with Section 31130) [Recreational Facilities], and Article 9 (commencing with Section 31135) [Sanitation Service]."[2]

---

[1] At the time of our September 5 opinion, Water Code section 30700.6 provided: "Notwithstanding Section 30021 or any other provision of the law, in the Sierra Lakes County Water District every owner of real property within the district, but no others, may vote at elections for directors or otherwise. Such owners need not be residents of the district in order to qualify as voters. The last equalized county assessment roll is conclusive evidence of ownership of the real property so owned. Where land is owned in joint tenancy, tenancy in common, or any other multiple ownership, the owners of such land shall designate in writing which one of the owners shall be deemed the owner of such land for purposes of qualifying as a voter. [¶] The legal representative of a corporation or estate owning real property may vote on behalf of such corporation or estate. As used in this section, legal representative means an official of a corporation owning real property or a guardian, executor, or administrator of the estate of the holder of title to real property who: [¶] (a) Is appointed under the laws of this state. [¶] (b) Is entitled to the possession of the estate's real property. [¶] (c) Is authorized by the appointing court to exercise the particular right, privilege, or immunity which he seeks to exercise. [¶] Before a legal representative votes at a district election he shall present to the precinct board a certified copy of his authority which shall be kept and filed with the returns of the election. [¶] Every voter, or his legal representative, may vote at any district election either in person or by a person duly appointed as his proxy, but shall be entitled to cast only one vote. The appointment of a proxy shall be as provided in Section 35005. Elections shall be conducted pursuant to Article 1 (commencing with Section 35106) of Chapter 2, Part 4, Division 13. [¶] This section shall not affect incumbent directors of the district, but in the event of a vacancy or upon the expiration of each present term, each such director, upon taking office or commencing a new term, shall be a voter as defined in this section."

[2] AB 3548 provides: "SECTION 1. Section 30700.6 of the Water Code is amended to read: [¶] 30700.6 (a) Notwithstanding Section 30021 or any other provision of the law, qualified voters at elections for directors or otherwise in the Sierra Lakes County Water District shall be (1) voters who are residents of the district, and (2) every owner of real property within the district, who is not a resident of the district. [¶] (b) The last equalized county assessment roll shall be conclusive evidence of ownership of the real property so owned. Where land is owned in joint tenancy, tenancy in common, or any other multiple ownership, the owners of the land shall designate in writing which one of the owners shall be deemed the owner of the land for

On October 12, 1990, Sierra Lakes County Water District (Sierra) petitioned the California Supreme Court for review of our September 5 decision. Two months later, the Supreme Court granted review and transferred the cause to this court with directions to vacate our September opinion and reconsider the matter in light of AB 3548. (Off. Reps. Cum. Subs. Hist. Table, Ad. Pamp. No. 7 (1991) p. 6.) Pursuant to those directions, we requested supplemental briefing on the following issues: "(1) The constitutionality of the enfranchisement of the nonresident landowner class as specified in amended section 30700.6, subdivision (a). [¶] (2) The effect, if any, of our decision constitutionally invalidating prior section 30700.6—under which the incumbent directors were elected—in light of amended section 30700.6, subdivision (e). (Please also specify the length of the directors' current terms of office.) [¶] (3) The effect, if any, of section 31015—curtailing Sierra's authorized powers—on the analysis set forth in our opinion of September 5, and on the two issues specified above. [¶] (4) Any other issue deemed relevant by the parties."

Initially, we consider whether Sierra is correct that AB 3548 renders this case moot. As we explain, it is appropriate for us to consider certain issues.

purposes of qualifying as a voter. [¶] (c) The legal representative of a corporation or estate owning real property may vote on behalf of the corporation or estate. As used in this section, legal representative means an official of a corporation owning real property or a guardian, executor, or administrator of the estate of the holder of title to real property who: [¶] (1) Is appointed under the laws of this state. [¶] (2) Is entitled to the possession of the estate's real property. [¶] (3) Is authorized by the appointing court to exercise the particular right, privilege, or immunity which he or she seeks to exercise. [¶] Before a legal representative votes at a district election, he or she shall present to the precinct board a certified copy of his or her authority which shall be kept and filed with the returns of the election. [¶] (d) Every voter, or his or her legal representative, may vote at any district election either in person or by a person duly appointed as his or her proxy, but shall be entitled to cast only one vote. The appointment of a proxy shall be as provided in Section 35005. Elections shall be conducted pursuant to Article 1 (commencing with Section 35106) of Chapter 2 of Part 4 of Division 13. [¶] (e) This section shall not affect incumbent directors of the district, but in the event of a vacancy or upon the expiration of each present term, each director, upon taking office or commencing a new term, shall be a voter as defined in this section. [¶] Sec. 2. Section 31015 is added to the Water Code, to read: [¶] 31015. The Sierra Lakes County Water District shall not exercise any of the powers and purposes set forth in Article 7 (commencing with Section 31120), Article 8 (commencing with Section 31130), and Article 9 (commencing with Section 31135). [¶] Sec. 3. The provisions of this act are necessary because there are a substantial number of resident voters in the Sierra Lakes County Water District, as well as a substantial number of landowners within the district, who are concerned with the affairs and support of the district. The problem is not common to all districts formed under the County Water District Law. It is therefore hereby declared that a general law cannot be made applicable and that the enactment of this act as a special law is necessary for the solution of problems existing in the Sierra Lakes County Water District. [¶] Sec. 4. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because this act is in accordance with the request of a local agency or school district which desired legislative authority to carry out the program specified in this act. Notwithstanding Section 17580 of the Government Code, unless otherwise specified in this act, the provisions of this act shall become operative on the same date that the act takes effect pursuant to the California Constitution."

After considering those issues, we hold: (1) that under AB 3548, Sierra is not a governmental district akin to a special land-serving district of limited purpose and powers where landowner-only voting is permissible (see *Salyer Land Co.* v. *Tulare Water District* (1973) 410 U.S. 719 [35 L.Ed.2d 659, 93 S.Ct. 1224]; *Associated Enterprises, Inc.* v. *Toltec District* (1973) 410 U.S. 743 [35 L.Ed.2d 675, 93 S.Ct. 1237]; and *Ball* v. *James* (1981) 451 U.S. 355 [68 L.Ed.2d 150, 101 S.Ct. 1811]); consequently, the pre-AB 3548 landowner-only voting scheme that placed the current directors in office cannot be used to validate those elections and a new election will have to be held; (2) that section 30700.6's enfranchisement of Sierra's nonresident landowners does not unconstitutionally dilute the votes of Sierra's residents in contravention of the equal protection guaranties of the federal and state Constitutions; and (3) that section 30700.6's enfranchisement of landowners—individual, corporate and estate—does not violate the voting qualifications set forth in article I, section 22, and in article II, sections 1 through 3, of the California Constitution.

## BACKGROUND

*The Nature of Sierra*

The critical facts are not in dispute. Sierra was formed in 1961 pursuant to the County Water District Law set forth in Water Code section 30000 et seq. (All further references to undesignated sections are to the Water Code.) In 1969 the landowner-only voting scheme of section 30700.6 was enacted.[3] (Stats. 1969, ch. 100, §§ 1-2, pp. 221-222.)

Sierra serves an area of 2,520 acres, which is slightly under 4 square miles. Of this amount, 2,153 acres (about 85 percent of the total acreage in the district) are still owned by the developer of the land within Sierra. Sierra's service area includes the Serene Lakes Development located near the Soda Springs Ski Resort in the Sierra Nevada Mountains. Sierra also provides services to the Royal Gorge Lodge and cross-country ski area.

Presently, there are 1,056 parcels of land in Sierra, of which 1,043 are residential lots each approximately one-quarter acre in size. Of the residential lots, 470-some are improved with homes or cabins; the remaining 560-plus (or over 50 percent of the total number of residential lots) are vacant. Sierra officials believe most of the homes and cabins are vacation homes. The number of year-round residents is unknown, but is estimated by plaintiffs to be around 200; Sierra contends the figure is substantially lower.

---

[3] See footnote 1, *ante*, page 1574.

There are 60-some registered voters residing in Sierra; 40 or so of these are Sierra landowners. By virtue of property ownership, over 975 voters—including persons, corporations, and estate representatives—qualify as voters in Sierra elections.

Sierra presently furnishes only domestic water and sewage disposal services. These two services are charged to the landowners. Owners of the vacant parcels pay standby charges.

Sierra's revenues for the 1987-1988 and 1988-1989 fiscal years were $657,000 and $681,000 respectively. Approximately one-third of these amounts was derived from property taxes on Sierra land levied to retire general obligation bonds secured by that land. Another one-third of these revenues was derived from water and sewer service charges for the respective years. The remaining one-third was derived from connection fees, general property taxes, standby assessments, penalties and interest earned.

*The Proceedings Below*

After being denied the opportunity to participate fully in the electoral process, Sierra residents Richard Bjornestad, Richard Clauser and Elizabeth Clauser (plaintiffs) petitioned for a writ of mandate and filed a complaint for injunctive and declaratory relief. Plaintiffs sought a declaration that section 30700.6 is unconstitutional under the equal protection clauses of the California and federal Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7); unconstitutional under article I, section 22 of the California Constitution, which provides that "[t]he right to vote or hold office may not be conditioned by a property qualification"; and unconstitutional under article II, section 2 of the California Constitution, which provides that "[a] United States citizen 18 years of age and resident in this state may vote." Plaintiffs also sought to postpone a Sierra board election scheduled for November 1989 and to prohibit nonresidents from voting or seeking election to the board. Additionally, Bjornestad and Elizabeth Clauser sought to become candidates for the board and voters in the board election; Bjornestad was foreclosed from the electoral process because he did not own land in Sierra; Elizabeth Clauser was foreclosed from participating because Richard Clauser was the single designated voter for the Clauser parcel.

The trial court ruled that the pre-AB 3548 section 30700.6 was unconstitutional under the equal protection clause of the federal Constitution. The court also postponed the November 1989 election so an election could take place under the Uniform District Election Law (Elec. Code, § 23500 et seq.; see Wat. Code, § 30068), which would govern in the absence of section

30700.6. Subsequently, the trial court stayed this judgment pending the outcome of this appeal. The November 1989 election took place under the dictates of the pre-AB 3548 section 30700.6.[4]

## DISCUSSION

### 1. *This Court Can Consider This Appeal*

■ Sierra as well as a Sierra landowner, as an amicus party, contend this appeal is moot because AB 3548 substantially changed the posture of this case and because plaintiffs obtained through AB 3548 the relief they sought in their complaint: the ability to vote in Sierra elections and be a member of Sierra's board of directors.

■ The law regarding the mootness of an appeal is set forth in *Alternatives for California Women, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 436 [193 Cal.Rptr. 384]: "An appeal may become moot if an ordinance or statute which constitutes the basis for the judgment under review is amended during the pendency of the appeal. [Citations.] The appeal may not be moot if the amendment includes, continues, or reenacts a material part of the enactment which was considered by the lower court. [Citations.] . . . [¶] In any event, [a court has] discretion to consider a question which is technically moot but which is 'an issue of continuing public interest that is likely to recur in other cases' and is 'likely to affect the future rights' of the [present] parties. . . . [Citations.]" (145 Cal.App.3d at pp. 444-445.) Courts frequently exercise such discretion to resolve constitutional issues pertaining to election laws. (*Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 539-540 [170 Cal.Rptr. 25, 620 P.2d 612], and cases cited therein.)

■ Here, AB 3548 did significantly change the posture of this case by granting residents the franchise and by curtailing substantially Sierra's authorized powers. Of course, these changes were not considered by the trial court. Nevertheless, we think the present forum is an appropriate place to address certain constitutional issues of law arising from AB 3548. (See *Libertarian Party* v. *Eu, supra,* 28 Cal.3d at pp. 539-540; *Adelson* v. *Hertz Rent-A-Car* (1982) 133 Cal.App.3d 221, 225-226 [183 Cal.Rptr. 779].) It would not be in the interest of judicial economy or electoral efficiency to remand these legal issues to the trial court only to have them subjected to our independent review in a subsequent appeal. (*Ibid.*; see also *Burrey* v.

---

[4] Three nonresident landowners were elected to the board in this election. Some Sierra residents brought a postelection action in the Placer County Superior Court challenging the legality of this election, and that action has apparently been abated pending the outcome of this case. (Placer County Super. Ct. No. 87755.)

*Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 675-676 [97 Cal.Rptr. 203, 488 P.2d 395]; 9 Witkin Cal. Procedure (3d ed. 1985) Appeal, §§ 241-242, pp. 246-249.) The parties have supplementally briefed these issues of law masterfully, the issues are of continuing public interest, and they are likely to affect the future rights of the parties. For these reasons, we exercise our discretion to consider them. (*Alternatives for California Women, Inc.* v. *County of Contra Costa, supra,* 145 Cal.App.3d at p. 445; *Libertarian Party, supra,* 28 Cal.3d at pp. 539-540.)

Sierra also argues that a remand to the trial court is necessary so the plaintiffs can amend their complaint and factual issues can be developed. The plaintiffs' complaint, however, is not limited to the issues of whether residents can vote in Sierra elections and be members of Sierra's governing board. The complaint also alleges that *only residents* can vote and be on the board or equal protection guarantees will be violated, that voting conditioned upon a property qualification violates article I, section 22 of the California Constitution, and that voting by corporations or estates or other "nonpersons" violates article II, section 2 of the California Constitution. These matters raise constitutional questions of law appropriate for our consideration.

The factual issues Sierra claims need to be developed are not materially relevant to the constitutional questions of law we address in this opinion. Those factual issues are: the number of current "permanent" residents in Sierra; the average length of residence of these residents; the portion of Sierra's budget borne disproportionately by landowners; the details of Sierra's lease with the Serene Lakes Property Owners Association of Sierra's only property with substantial recreation potential; the dates on which the plaintiff Clausers bought and sold two Sierra parcels; and the fire and garbage services currently being provided by other governmental entities. Sierra moved for this court to take additional evidence on these matters. We denied the motion. The evidence set forth in that motion is not materially different—for the constitutional analyses we undertake in this opinion— from the evidence set forth in the trial court below. In short, all of the constitutionally relevant facts—and there are not that many—were presented and litigated below and are essentially undisputed.

Our decision to address certain of the paramount constitutional issues raised by AB 3548 is supported by the California Supreme Court decision in *Burrey* v. *Embarcadero Mun. Improvement Dist., supra,* 5 Cal.3d 671. *Burrey* involved an equal protection challenge by nonlandowning residents— living in a municipal improvement district—who were precluded from voting in district elections. (*Id.* at pp. 672-673.) In the following language, the *Burrey* court noted that election cases often present legal issues which can

be resolved more efficiently at the appellate level: "In election cases, where, as here, the issues are of great public importance and must be resolved promptly, we will exercise our original jurisdiction in mandamus proceedings. [Citations.] The issues are important because they concern the impairment of the right to vote; their resolution is urgent because an election, at which two or three of the five board seats are to be filled for a four-year term, is scheduled for early November 1971. . . . [¶] And even if petitioners were not maximally diligent, we should not perpetuate the unconstitutional voting procedure for another two years and its effect another four thus denying all the residents of the EMID a proper voice in their district. . . . [¶] Respondents argue that we should not exercise our jurisdiction because there exist numerous questions of fact which must be resolved prior to any decision in the case. The petition for writ of mandate does contain allegations of fact which are controverted by respondent and intervener. We are satisfied that these disputed facts are either not material to our resolution of the case, or may be resolved by judicial notice." (5 Cal.3d at pp. 675-676.)

Much of what was said in *Burrey* can be said here. This case, too, concerns the impairment of the right to vote: under AB 3548, plaintiffs contend the votes of nonresident landowners unconstitutionally dilute the votes of residents. Moreover, there is an election scheduled for November 1991 to fill two director positions; the other three director positions were elected in the November 1989 election and run through November 1993. The constitutionality of these positions—all elected pursuant to a landowner-only voting scheme—is in question. As in *Burrey*, we should not perpetuate an unconstitutional voting procedure. Finally, for the reasons expressed above, the factual context of the constitutional issues presented by AB 3548 is akin to the factual context in *Burrey*. We turn therefore to our first substantive issue.

2. *A New Board Election Will Have to Be Held Because Landowner-Only Voting Is Unconstitutional for the Newly Structured Sierra*

AB 3548 specifies under subdivision (e) of section 30700.6 that the new voting scheme in section 30700.6 "shall not affect incumbent directors of the district, but in the event of a vacancy or upon the expiration of each present term, each director, upon taking office or commencing a new term, shall be a voter as defined in [section 30700.6, subdivision (a)]." (§ 30700.6, subd. (e).) Under this provision, the present Sierra directors—all of whom were elected under the pre-AB 3548 landowner-only voting scheme—can retain their positions until regularly scheduled elections. Of course, we ruled this pre-AB 3548 voting scheme unconstitutional in the context of the powers exercised by and authorized to Sierra at that time. We cannot,

however, simply repeat our prior constitutional analysis and hold that the present Sierra directors were elected under an unconstitutional landowner-only voting scheme. This is because Sierra's authorized powers have been curtailed substantially by AB 3548's addition of section 31015 to the Water Code. Under section 31015, Sierra lost its authorized powers over fire protection facilities (§ 31120 et seq.), recreational facilities (§ 31130 et seq.), and sanitation services (§ 31135 et seq.).

■■■ The issue, therefore, becomes whether Sierra under AB 3548 is a governmental district akin to the districts in *Salyer Land. Co.* v. *Tulare Water District, supra*, 410 U.S. 719, *Associated Enterprises,* Inc. v. *Toltec District, supra*, 410 U.S. 743, and *Ball* v. *James, supra*, 451 U.S. 355, where landowner-only voting was constitutionally permissible. If Sierra under AB 3548 is akin to those districts, the present directors can serve their terms because they were elected pursuant to a landowner-only voting procedure permissible in such districts. If Sierra is not like a *Salyer-Toltec-Ball* district, however, a new election for directors will have to be held. As we explain, a new election is required.[5]

Some background is helpful. Specifically, the issue here is whether Sierra is a special limited-purpose district that disproportionately affects landowners as a group and is therefore permitted to restrict the franchise solely to landowners contrary to the "one person, one vote" popular election principle established in the seminal decision of *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]. (See *Salyer Land Co.* v. *Tulare Water District, supra*, 410 U.S. at p. 728 [35 L.Ed.2d at p. 666].) ■■■ The "one person, one vote" principle is founded upon the fundamental tenet that legislators of governmental entities of general purpose and powers "represent people, not trees or acres." (377 U.S. at p. 562 [12 L.Ed.2d at p. 527].) In *Reynolds*, the principle was applied to the apportionment of state legislatures. Subsequently, the principle was extended to local government (*Avery* v. *Midland County* (1968) 390 U.S. 474 [20 L.Ed.2d 45, 88 S.Ct. 1114], [holding the principle applicable to county government officials who had general governmental powers over the entire county]) and then to a more limited district—a junior college district. (*Hadley* v. *Junior College District* (1970) 397 U.S. 50 [25 L.Ed.2d 45, 90 S.Ct. 791], [holding the principle applicable to junior college trustees who exercised general governmental

---

[5] For two reasons, one cannot say that a new election is mandated *merely* because the present Sierra directors were elected in the context of a different district. First, such a position fails to give any credence to section 30700.6, subdivision (e), specifying that incumbent directors shall not be affected by the new voting scheme. Second, Sierra landowners elected the present directors when the directors were imbued with substantially more power; surely the same directors would have been elected by the landowners if imbued with significantly less power.

powers and performed important governmental functions that had sufficient impact throughout the district].) *Hadley*, however, noted a possible exception to this principle: "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately [a]ffect different groups that a popular election in compliance with [the 'one person, one vote' principle] might not be required, . . ." (397 U.S. at p. 56 [25 L.Ed.2d at p. 51].)

Such cases were found in *Salyer*, *Toltec*, and *Ball*.

In *Salyer*, the scheme for electing the directors of a California water storage district survived an equal protection challenge. (See § 39000 et seq.) Under that scheme, only landowners could vote and voting power was apportioned according to the assessed valuation of the landowner's property. (410 U.S. at p. 725 [35 L.Ed.2d at p. 664]; §§ 41000, 41001.) The district in *Salyer* was comprised of nearly 200,000 acres of farmland and a population of 77; most of the residents worked for the 4 corporations that farmed 85 percent of the land in the district. (410 U.S. at p. 723 [35 L.Ed.2d at p. 663].)

The court in *Salyer* recognized that the district was vested with some typical governmental powers, including the power to hire and fire workers, contract for construction projects, condemn private property and issue general obligation bonds. (410 U.S. at p. 728, fn. 7 [35 L.Ed.2d at p. 666].) However, the court concluded that the district had "relatively limited authority" because its "primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming" in the district. (*Id.* at p. 728 [35 L.Ed.2d at p. 666].) The court also noted that the district's financial burdens could fall only on landowners in proportion to the benefits they received from the district. (*Id.* at pp. 729, 731 [35 L.Ed.2d at p. 667, 668].) For these reasons, the *Salyer* court concluded: "[T]he . . . water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the [one person, one vote] rule laid down in Reynolds which . . . Hadley . . . and the decision in Avery . . . contemplated." (*Id.* at p. 728 [35 L.Ed.2d at p. 666].)

Because the *Salyer* court deemed the "one person, one vote" principle inapplicable, it also deemed inapplicable the strict scrutiny compelling interest test flowing from that principle. (410 U.S. at pp. 730-731 [35 L.Ed.2d at p. 667-668]; see *Kramer* v. *Union Free School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Phoenix* v. *Kolodziejski* (1970) 399

U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990]; and *post*, pp. 1586-1587.) Applying the less-demanding rational basis test, the *Salyer* court concluded the voting scheme did not violate the federal equal protection clause because the California Legislature could rationally have assumed that without apportioning voting power according to land value, the landowners may have been unwilling to subject their lands to assessment liens which made the creation of the district possible. (410 U.S. at pp. 730-731 [35 L.Ed.2d at pp. 667-668]; see *McGowan* v. *Maryland* (1961) 366 U.S. 420 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101] and *post*, pp. 1586-1587.)

*Toltec*, decided the same day as *Salyer*, involved a landowner voting scheme apportioned according to acreage. (410 U.S. at p. 744 [35 L.Ed.2d at p. 677].) Like the water storage district in *Salyer*, the watershed district in *Toltec* was determined to be a limited purpose one disproportionately affecting landowners. Similarly, the equal protection challenge in *Toltec* fell victim to the rational basis test, the court determining the state could rationally conclude that since landowners are primarily burdened and benefitted by the district, the vote may be conditioned accordingly. (*Id.* at pp. 744-745 [35 L.Ed.2d at p. 677].)

*Ball* completed the trilogy of landowner voting cases pertinent here. At issue in *Ball* was the constitutionality of a landowner voting scheme, apportioned according to acreage, for a large water reclamation district in Arizona. (451 U.S. at p. 357 [68 L.Ed.2d at p. 154].) Unlike the water storage district in *Salyer*, the reclamation district in *Ball* exercised its statutory authority to generate and sell electric power and had become one of Arizona's largest suppliers of electricity. (*Id.* at pp. 357, 363-365 [68 L.Ed.2d at pp. 154, 158-159].) Furthermore, unlike the *Salyer* district, which delivered water solely for agricultural use, the *Ball* district delivered roughly 40 percent of its water to urban areas or agricultural areas for nonagricultural use. (*Id.* at p. 365 [68 L.Ed.2d at pp. 159-160].) Finally, whereas all operating costs of the *Salyer* district were borne by landowners, most of the capital and operating costs of the *Ball* district had been met through its electrical power revenues. (*Id.* at pp. 365-366 [68 L.Ed.2d at pp. 159-160].) Nevertheless, said the court in *Ball*, a careful examination disclosed that *Salyer* applied and the voting scheme was constitutional. (*Id.* at p. 366 [68 L.Ed.2d at p. 160].)

This careful examination centered on three factors. First, the district in *Ball* did not exercise the sort of governmental powers that invoke the one person, one vote principle. The district could not impose ad valorem property taxes or sales taxes nor could it enact any laws governing the conduct of its citizens. It also did not administer such normal governmental functions as the maintenance of streets or the operation of schools, or sanitation, health, or welfare services. (451 U.S. at p. 366 [68 L.Ed.2d at p. 160].)

Second, even the district's water functions were relatively narrow. The district could not own, sell, or buy water, nor could it control the use of any water it delivered. This lack of authority over water use and the fact that the district distributed all of its water according to land ownership were deemed the constitutionally relevant facts; the distinction between agricultural and urban land was deemed to be of no special constitutional significance. (451 U.S. at pp. 367-368 [68 L.Ed.2d at pp. 160-161].)

Finally, the size of the district's power business did not affect the legality of the landowner voting scheme. The court in *Ball* noted that the provision of electricity is not a traditional element of governmental sovereignty. Moreover, the parties had stipulated that the district's electric power functions were merely incidental to its water functions, which were the district's primary purpose. (451 U.S. at pp. 368-369 [68 L.Ed.2d at pp. 161-162].) The court also noted that only landowners were subject to land assessment liens to secure district bonds and subject to the district's acreage-based taxing power; and only landowners had ever committed capital to the district. (*Id.* pp. 368, 370.) The court applied the rational basis test and concluded the voting scheme was constitutional, largely for the reasons expressed in *Salyer.* (*Id.* at p. 371 [68 L.Ed.2d at p. 163].)

Recently, the United States Supreme Court had occasion to characterize the essence of the *Salyer-Toltec-Ball* line of cases. In *Quinn* v. *Millsap* (1989) 491 U.S. 95 [105 L.Ed.2d 74, 109 S.Ct. 2324], the court invalidated, under the equal protection clause, a landowner requirement for membership on a public board charged with drafting a plan of municipal reorganization to be submitted to voters in a general election. In distinguishing the *Salyer*-line of cases, the court in *Quinn* stated: "Whereas it was rational for the States in those cases to limit voting rights to land owners [citations], the 'constitutionally relevant fact' there was 'that all water delivered by [those districts was] distributed according to land ownership.' [Citations.] The purpose of the board [here], however, is not so directly linked with land ownership." 491 U.S. at p. 109 [105 L.Ed.2d at p. 90.] The *Quinn* court also emphasized "'the peculiarly narrow function of [the] local government body'" in *Ball* and that body's "'special relationship'" to landowners. (*Ibid.,* quoting *Ball* v. *James, supra,* 451 U.S. at p. 357 [68 L.Ed.2d at p. 357].)

Both Sierra and plaintiffs argue the issue is easily resolved here. As one would expect, however, they come to opposite conclusions. Plaintiffs rely on section 3 of AB 3548 which provides in pertinent part that the "provisions of this act are necessary because there are a substantial number of resident voters in [Sierra], as well as a substantial number of landowners within the district, who are concerned with the affairs and support of the district."

Section 3's recognition of the interests of residents, argue plaintiffs, concedes the fact that the *Salyer*-line of cases is inapplicable here. Sierra counters that section 31015's curtailment of Sierra's authorized powers evidences unequivocally the Legislature's intent to align Sierra with the districts in *Salyer, Toltec* and *Ball.*

■ We agree with plaintiffs that Sierra is not as limited a district as the districts in *Salyer, Toltec* and *Ball.* A *Salyer*-type district is a governmental entity of "special limited purpose" whose activities "disproportionate[ly] [a]ffect[]" landowners as a group. (410 U.S. at p. 728 [35 LE.d.2d at p. 666].) AB 3548's recognition that there are a substantial number of residents, including nonlandowning residents, in Sierra who are concerned with the affairs and support of that district is a powerful recognition that Sierra does not engage in activities disproportionately affecting landowners as a group. (See AB 3548, §§ 1, 3.)

A few general observations bolster our view. Sierra's primary purpose is to provide domestic water and sewer services. This aligns with a county water district's primary purpose of "furnishing water to its *inhabitants.*" (*Glenbrook Development Co.* v. *City of Brea* (1967) 253 Cal.App.2d 267, 274 [61 Cal.Rptr. 189], italics added.) As noted without hesitation in *Johnson* v. *Lewiston Orchards Irr. Dist.* (1978) 99 Idaho 501 [584 P.2d 646]—a case which invalidated a landowner-only voting scheme for a domestic water district—"[d]omestic water service, of course, substantially affects not just landowners but all . . . residents." (584 P.2d at p. 650; accord, *Wright* v. *Town Bd. of Carlton* (1973) 41 A.D.2d 90 [342 N.Y.S.2d 577].) Furthermore, the constitutionally relevant facts recognized in *Ball* were that the district there distributed all of its water according to land ownership, and could not control the use of any water it delivered. (*Ball, supra,* 451 U.S. at pp. 367-368 [68 L.Ed.2d at pp. 160-161]; see also *Quinn* v. *Milsap, supra,* 491 U.S. at p. 109 [105 L.Ed.2d at p. 90].) That simply is not the case here. As recognized by the Legislature in AB 3548, the purpose of Sierra—to use *Quinn'*s words—is "not so directly linked with land ownership." (*Quinn, supra,* 491 U.S. at p. 109 [105 L.Ed.2d at p. 90].) And even with its reduced powers, Sierra can still pass misdemeanor ordinances governing residential use of water and sewer services. (§§ 31026-31029, 31105-31106.) This is in stark contrast to the district in *Ball,* which could not enact any laws governing the conduct of its citizens. (*Ball, supra,* 451 U.S. at p. 366 [68 L.Ed.2d at p. 160].)[6]

Therefore, Sierra's residents have a vital stake in their district and cannot be denied a voice in its affairs. All five present directors, however, were

---

[6] As we shall see in the next section of this opinion, our conclusion that Sierra is not a *Salyer*-type district does not automatically mean Sierra is a governmental entity of general purpose and powers.

elected under a scheme which foreclosed residents who did not own land in Sierra, and residents who did but who were not designated to vote, from expressing their legislatively and constitutionally recognized interests at the ballot box. The present directors were therefore elected pursuant to a scheme which unconstitutionally disenfranchised certain interested voters, and all five board of director positions will have to be elected anew in a special election. Accordingly, we hold subdivision (e) of section 30700.6 unconstitutional. This unconstitutional provision, however, is severable from the remainder of AB 3548. ■ " 'The test of severability is whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the statutory scheme, or the utility of the remaining provisions.' " (*Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 964 [104 Cal.Rptr. 297, 501 P.2d 537], quoting *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 238 [18 Cal.Rptr. 501, 368 P.2d 101].) ■ That test is easily met here. Subdivision (e) of section 30700.6 is a discrete part of AB 3548 and the remedy of a special election is readily available. We turn now to the question of whether AB 3548's enfranchisement of Sierra's nonresident landowners unconstitutionally dilutes the votes of Sierra's residents.

3. *Enfranchising the Nonresident Landowners Does Not Unconstitutionally Dilute the Votes of Residents*

■ Plaintiffs contend that AB 3548's enfranchisement of Sierra's nonresident landowners unconstitutionally dilutes the votes of Sierra's residents. We disagree.

This contention has its constitutional grounding in the equal protection guaranties of the federal and California Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)[7] ■ As observed in *Reynolds*, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (377 U.S. at p. 555 [12 L.Ed.2d at pp. 523-524].) Of course, *Reynolds* made this observation in the context of a grossly malapportioned state legislature where certain rural residents had a significantly greater per capita voting strength than urban residents. (See Tribe, American Constitutional Law (2d ed. 1988), § 13-3, p. 1065.)

---

[7] The Fourteenth Amendment to the United States Constitution provides in pertinent part: ". . . [N]or shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article I, section 7 of the California Constitution provides in pertinent part: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; . . ."

■ The first step in evaluating an equal protection contention is to determine the test to be applied in considering the validity of the law which is alleged to have imposed unequal burdens or to have granted unequal advantages. (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 669-670 [122 Cal.Rptr. 377, 536 P.2d 1337]; *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 798 [187 Cal.Rptr. 398, 654 P.2d 168].) Under the "compelling interest" test, the state must show the law serves a compelling governmental interest and that any distinction drawn is necessary to further that interest. (*Choudhry* v. *Free, supra*, 17 Cal.3d at p. 664; *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 342-343 [31 L.Ed.2d 274, 284-285, 92 S.Ct. 995].) Under the less demanding "rational basis" test, a law does not deny equal protection if facts may reasonably be conceived to support it. (*McGowan* v. *Maryland, supra*, 366 U.S. 420, 426 [6 L.Ed.2d 393, 399]; *Gould* v. *Grubb, supra*, 14 Cal.3d at p. 670.) In most equal protection cases, the rational basis test is used; however, in cases involving "suspect classifications" or "fundamental interests," the compelling interest test is employed. (*Curtis* v. *Board of Supervisors, supra*, 7 Cal.3d 942, 951-952.)

■ Relying on *Curtis* v. *Board of Supervisors, supra*, 7 Cal.3d 942 and *Erven* v. *Board of Supervisors* (1975) 53 Cal.App.3d 1004 [126 Cal.Rptr. 285], plaintiffs argue the compelling interest test applies here. In *Curtis*, the court applied the compelling interest test and held that Government Code section 34311 was unconstitutional under the equal protection guaranties of the California and federal Constitutions. At the time of *Curtis*, California law allowed the formation of a new city upon a favorable vote in an election in which all adult residents within the proposed boundaries cast one vote each. However, Government Code section 34311 granted landowners owning a majority of assessed valuation of land within those boundaries the power to refuse to call this election. According to the court in *Curtis*, "a statute which confers power to halt an election, and thus to prevent all qualified voters from casting their vote, must be considered to 'touch upon' and to 'burden' the right to vote, and therefore must be examined under the strict equal protection standards." (7 Cal.3d at p. 955, fn. omitted.)

In addressing the argument that nonresident landowners have a compelling interest in whether the proposed city in which they own property should be incorporated, the *Curtis* court stated: "Respondents point out, however, that nonresident landowners also have an interest in whether the city shall be incorporated, but have no right to vote in the incorporation election. Section 34311, however, cannot be upheld upon a theory that it is necessary to secure a state interest in giving nonresident landowners a voice in incorporation. The problem is that section 34311 does not merely grant

such landowners a concurrent voice in the incorporation of a city; it gives them a veto. [] Yet it is the residents of a region, not the nonresident landowners, who as a class are the more deeply concerned with its government. [Citing *Burrey, supra.*] The residents have a constitutional right to vote in municipal elections [citing *Avery, supra*]; the nonresident landowners have no such right (see *Chadwell* v. *Cain* (1959) 169 Ohio St. 425, 431 [8 Ohio Ops.2d 449, 160 N.E.2d 239]). It is open to question whether the state can give nonresidents a vote equivalent to that of residents; we entertain no doubt that the state cannot enact a provision which gives absentee and corporate landowners the power to *override* the needs and interests of the residents." (7 Cal.3d at pp. 962-963 italics in original.)

*Curtis* encompassed an election involving a governmental entity with general powers—a city. As recognized in *Curtis*: ". . . [R]espondents lay particular emphasis on special districts of limited powers, pointing to some 42 statutes which restrict the right to sign petitions or instruments of protest to landowners. We point out that for the most part these statutes involve special districts that cater to, and express, special interests. Our holding in the instant case pertains to the validity of a restricted franchise as to the formation of a city of general powers and does not necessarily apply to special districts, whose design, powers and methods of financing are more closely related to ownership of land. (See *Avery* v. *Midland County* (1968) 390 U.S. 474, 484 [20 L.Ed.2d 45, 53, 88 S.Ct. 1114].)" (7 Cal.3d at p. 960.)

*Erven*, too, involved a governmental entity of general purpose and powers. In *Erven*, the court dismissed an argument that nonresident landowners were denied equal protection because only registered voters residing in a county service area were eligible to vote at a tax rate election for the area. After citing the above quoted *Curtis* language about the interests of residents versus nonresidents, the *Erven* court concluded "[i]t is doubtful that [a resident and landowning nonresident] voting scheme can ever meet the strict scrutiny test with respect to elections held by governmental entities exercising general governmental powers." (53 Cal.App.3d at p. 1017.) A county service area, noted *Erven*, is merely an extension of a county, a governmental entity exercising general powers. As such, county service area elections are municipal in nature and excluding nonresident landowners from such elections is constitutional. (*Ibid.*)

Our conclusion in the previous section of this opinion that Sierra is not a district in the mold of *Salyer-Toltec-Ball* does not lead us to conclude that Sierra is a governmental entity of general purpose and powers like the entities in *Curtis* and *Erven*. By adding section 31015 to the Water Code, AB 3548 has substantially reduced Sierra's authorized powers. In our vacated opinion, we noted with particularity the full fire and attendant peace

officer powers authorized to Sierra under section 31120 et seq. (see also Health & Saf. Code, § 13851 et seq.). Those powers are gone. (§ 31015.) Also gone are the powers over sanitation services and recreation, powers vitally important to residents as a group. (§§ 31015, 31135 et seq., 31130 et seq.) Sierra is now limited essentially to providing water and sewer services and structuring the arrangements to finance those services. (See §§ 31020-31035, 31030, 31370, 31650, 31700, 31701, 31702.1-31703 [Sierra also retains the power to generate and sell hydroelectric power, declare nuisances, and take property. (§§ 31149.1-31149.2, 31103 and 31040-31041.)].) Furthermore, it would not be fair to note that AB 3548 recognizes that a substantial number of residents in Sierra, including nonlandowning residents, are concerned with the affairs and support of the district, yet fail to note the same statute recognizes that a substantial number of landowners, including nonresident landowners, are similarly concerned. (AB 3548, §§ 1, 3.) Nor can the nature of Sierra be ignored. At present, Sierra is primarily a second-home, vacation community with a relatively low number of permanent residents. It is a community situated in an area of tremendous snowfall. And its financial burdens are borne largely by its landowners.

Neither *Curtis* nor *Erven* involved a resident and nonresident electoral scheme concerning a non-general governmental entity or a governmental entity legislatively found to affect a substantial number of nonresident landowners. Nor have we or the parties found any other California decision in line with these factors.

However, a number of lower federal court decisons provide guidance. In all but one of these decisions—and that one has been criticized—the courts applied the "rational basis" test to uphold resident-nonresident voting schemes against claims that the votes of nonresidents unconstitutionally diluted the votes of residents. ■ Although we are not bound by lower federal court decisions, they are persuasive and entitled to great weight. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

These federal cases are as follows. In *Collins* v. *Town of Goshen* (2d Cir. 1980) 635 F.2d 954, a section of the Town of Goshen known as Arcadia Hills had its own water district whose officials were the Town Board elected by all the residents of the Town, not just the residents of Arcadia Hills. The court decided this scheme was rational because the Town had often advanced town revenues to keep the Arcadia Hills Water District afloat, so to speak. (*Id.* at p. 959.)

In a series of Fifth and Eleventh Circuit cases dealing with Alabama legislation permitting residents of cities with independent school systems to vote in county school board elections, the courts employed the rational

basis test, phrased as follows: "The party seeking to exclude city residents from voting in the county school board elections has the burden of demonstrating that the application of the Alabama statute here is irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county school board members. The test for whether the statute is irrational as applied to the particular county is whether the city residents have a substantial interest in the operation of the county school system. If the city residents do not have a substantial interest, then the state must exclude the city residents from voting." (*Sutton* v. *Escambia County Bd. of Educ.* (11th Cir. 1987) 809 F.2d 770, 772 (citations omitted); see also *Davis* v. *Linville* (11th Cir. 1989) 864 F.2d 127; *Hogencamp* v. *Lee County Bd. of Educ.* (11th Cir. 1984) 722 F.2d 720; *Phillips* v. *Andress* (5th Cir. 1981) 634 F.2d 947; *Creel* v. *Freeman* (5th Cir. 1976) 531 F.2d 286, cert. den. (1977) 429 U.S. 1066 [50 L.Ed.2d 784, 97 S.Ct. 797].) Some of these decisions found that city residents had the requisite substantial interest; others did not. But the rational basis test was used in all of them.

In *Clark* v. *Town of Greenburgh* (2d Cir. 1971) 436 F.2d 770, the Town of Greenburgh was divided into six incorporated villages, each substantially self-governing, and an unincorporated area. The chief function of the town board was to govern the unincorporated area but the village residents could vote in town board elections. The unincorporated residents challenged this scheme but the court found the challenge "plainly insubstantial," in part because village residents were taxed for about 5 percent of the unincorporated area's budget and were entitled to use some of the unincorporated area's facilities. (*Id.* at p. 771-772.)

Using the rational basis test, the court in *Cantwell* v. *Hudnut* (7th Cir. 1977) 566 F.2d 30, certiorari denied (1979) 439 U.S. 1114 [59 L.Ed.2d 71, 99 S.Ct. 1015], upheld an Indiana statute which allowed four city-county councilpersons elected at large from a merged city and county to sit on the councils of special police and fire districts consisting of only parts of the merged area.

Three cases have applied the rational basis test to electoral schemes permitting nonresident landowners to vote in municipal elections for the city in which they owned property. Two of these cases involved the same resort town in which the enfranchised nonresident landowners owned a significant percentage of the town's assessed valuation and had to be residents of the county in which the resort town was situated. (*Spahos* v. *Mayor and Councilmen of Savannah Beach* (S.D.Ga. 1962) 207 F.Supp. 688, affd. (1962) 371 U.S. 206 [9 L.Ed.2d 269, 83 S.Ct. 304]; *Glisson* v. *Mayor and Councilmen of Savannah Beach Ga.* (5th Cir. 1965) 346 F.2d 135.) The third case concerned municipal elections in Chattanooga, Tennessee.

(*Brown* v. *Board of Com'rs of Chattanooga, Tenn.* (E.D.Tenn. 1989) 722 F.Supp. 380.)

Standing alone in its application of the compelling interest test is the decision in *Locklear* v. *North Carolina State Bd. of Elections* (4th Cir. 1975) 514 F.2d 1152. City residents in that case had independent school boards but were allowed to vote for seven of the eleven members of the county school board. The court applied strict scrutiny to find this scheme unconstitutionally diluted the votes of county residents who did not live in any of the cities. According to the *Locklear* court, this application followed from *Reynolds*'s observation that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (*Id.* at p. 1154.) Citing *Kramer* v. *Union Free School District, supra,* 395 U.S. 621, the *Locklear* court noted that the compelling interest test is applied to electoral schemes which deny the franchise to citizens who are otherwise qualified by residence and age. (514 F.2d at p. 1154; in *Kramer,* the compelling interest test was applied to invalidate a statute limiting the electorate in certain school board elections to owners or lessees of taxable property in the school district, their spouses, and the parents and guardians of school children; see also two important cases applying *Kramer, Cipriano* v. *City of Houma, supra,* 395 U.S. 701 [using the compelling interest test to invalidate an electoral scheme which denied nonlandowning residents of a municipality the right to vote in the municipal utility's revenue bond elections] and *Phoenix* v. *Kolodziejski, supra,* 399 U.S. 204 [similarly invalidating a *Cipriano*-like electoral scheme involving a city's general obligation bond elections].)

*Locklear* was criticized in *Phillips* v. *Beasley* (N.D.Ala. 1978) 78 F.R.D. 207 (three-judge court; reversed on other grounds in *Phillips* v. *Andress, supra,* 634 F.2d 947.) The facts in *Beasley* were similar to those in *Locklear.* The court in *Beasley* did not think the *Reynolds* observation about vote debasement or dilution justified application of the compelling interest test. As noted in *Beasley, Reynolds* involved "the apportionment of voting power for election of the state legislature unequally among different groups of voters, all of whom were considered to have an equal interest in the bodies to be elected;" in contrast, stated *Beasley,* "the city-county school board situation [presents] the question [of] how suffrage should be granted among putative electors having different degrees of interest in the special body to be elected." (*Id.* at p. 211; see *Collins* v. *Town of Goshen, supra,* 635 F.2d at p. 959.) According to *Beasley,* "[a] requirement in these circumstances, as *Locklear* suggests, that the state show a compelling justification for *including* in the electorate those with the lesser interest might, indeed, conflict with a requirement under [*Kramer*] that the state similarly justify its *excluding* such voters." (*Ibid.,* italics in original.) *Beasley* determined the

plaintiffs there must demonstrate that the inclusion of voters is irrational because such voters have only an insubstantial interest in the governmental entity involved. (*Id.* at pp. 211-212.)

The rational basis test is employed in these federal cases for a number of reasons. First, these cases, unlike *Kramer* and its progeny, do not concern electoral schemes that *deny* the franchise to citizens who are otherwise qualified by residence and age. (See, e.g., *Collins* v. *Town of Goshen, supra,* 635 F.2d at p. 957.) The basic principle expressed in the *Kramer* line of cases is that as long as the election at issue is not one of special interest, any classification *denying* the franchise on grounds other than residence, age, and citizenship cannot stand unless the governmental entity can demonstrate that the classification serves a compelling state interest. (*Hill* v. *Stone* (1975) 421 U.S. 289, 297 [44 L.Ed.2d 172, 179, 95 S.Ct. 1637].) In the rational basis cases, the election laws expand rather than restrict the franchise. (*Brown* v. *Board of Com'rs of Chattanooga, Tenn., supra,* 722 F.Supp. at p. 398.) As noted in *Sutton,* overinclusiveness is a lesser constitutional evil than underinclusiveness. (809 F.2d at p. 775; see also *Brown, supra,* 722 F.Supp. at p. 398.) Also flowing from the *Kramer* contrast is the issue of the nature of the governmental entity involved—is it a district of limited purpose and powers or a body exercising general governmental powers? (See *Collins, supra,* 635 F.2d at p. 959; *Beasley, supra,* 78 F.R.D. at p. 211; *Cantwell, supra,* 566 F.2d at p. 36.) Related to this inquiry is another substantial concern—that a strict scrutiny approach may hamper the creation of innovative local government units. Many of the rational basis cases cite to the passage from *Avery* which states: "This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems." (390 U.S. at p. 485 [20 L.Ed.2d at p. 53].) (See, e.g., *Collins, supra,* 635 F.2d at p. 959; *Cantwell, supra,* 566 F.2d at p. 38.) This principle was reiterated in *Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 199 S.Ct. 383] where the court emphasized "the extraordinarily wide latitude that States have in creating various type[s] of political subdivisions and conferring authority upon them." (439 U.S. at p. 71 [58 L.Ed.2d at p. 303], fn. omitted.) Finally, the rational basis cases do not deal with malapportionment of a general governmental entity resulting in lesser-weighted votes on an individual basis, or with discrete and insular groups foreclosed hopelessly from the political process, or with invidious discrimination. (See Tribe, American Constitutional Law, *supra,* §§ 13-2—13-9, at pp. 1063-1084.)

■ We think these reasons for applying the rational basis test apply in this case. Section 30700.6 expands rather than restricts the franchise. This

expansion aligns with legislative findings of who has substantial interests in the affairs and support of Sierra. (AB 3548, § 3.) As we have seen, Sierra is not a governmental entity of general purpose and powers. It is currently a district with relatively few permanent residents and a lot of nonresident landowners. As we have seen, both residents and nonresident landowners in Sierra have substantial interests in the district. At times, these interests may converge—for example, all parties desire quality water and sewer services. At other times, these interests may diverge—for example, how to structure the financing to provide these services. Application of the compelling interest test in these circumstances would play havoc with AB 3548's innovative electoral scheme, which identifies the substantially interested voters and genuinely tries to accomodate their interests.

Plaintiffs contend they are akin to a discrete and insular minority group foreclosed hopelessly from the political process given the overwhelming number of nonresident landowners. (See Tribe, American Constitutional Law, *supra*, §§ 13-7—13-9, at pp. 1074-1084.) They argue this nonresident landowner voting strength is analogous to the electoral veto in *Curtis*. On this basis, plaintiffs claim strict scrutiny is necessary. We disagree.

Preliminarily, we note the overwhelming number of nonresident landowners also argue in favor of the recognition of their substantial interest in Sierra. (AB 3548, §§ 1, 3.) In any event, plaintiffs' point is not well taken. Plaintiffs' argument assumes residents will vote one way and landowners another. Consequently, the argument goes, residents will never have a meaningful voice in the district and the landowners effectively can veto any resident proposal. The fallacy of this argument is that section 30700.6 is structured in such a way that as the residents in Sierra increase so, in a correlative fashion, will their political power. This aligns with constitutional principles. (See *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627 [75 Cal.Rptr. 766, 451 P.2d 406]; *Burrey* v. *Embarcadero Mun. Improvement Dist.*, *supra*, 5 Cal.3d at pp. 682-684.) Such was not the case with the landowner veto in *Curtis*. Assuming the landowners voted as a bloc in *Curtis*, they would *always* retain power. There was no theoretical way of defeating this stranglehold. Accordingly, the Sierra resident, at the present time, is more like a Republican in San Francisco than a nonlandowning resident in *Curtis*. As a result, voting dilution on a *group* basis between residents and nonresident landowners in Sierra under AB 3548's amendment of section 30700.6 is not an issue giving rise to strict scrutiny. (See Tribe, American Constitutional Law, *supra*, §§ 13-7—13-9, at pp. 1074-1084; cf. *id.*, § 13-3, at pp. 1063-1066.)

Nor can plaintiffs argue successfully that strict scrutiny is required because the *individual* vote of a Sierra resident is unconstitutionally diluted by the enfranchisement of nonresident landowners. (See *Burrey*, *supra*, 5

Cal.3d at p. 678; Tribe, American Constitutional Law, *supra*, §§ 13-3—13-6, at pp. 1063-1074, cf. § 13-7, pp. 1074-1076.) Sierra does not present the case of a malapportioned electoral scheme based on geographical residency (*Reynolds*) or on large land ownership (*Curtis*). The vote of each resident and of each landowner are counted equally. "From an individual viewpoint," there is no constitutional problem in comparing the vote of a Sierra resident with that of a Sierra nonresident landowner. (*Burrey, supra*, 5 Cal.3d at p. 678.)

For all of these reasons, we conclude the rational basis test applies. That test upholds a law against an equal protection challenge if facts may reasonably be conceived to support it. (*McGowan* v. *Maryland, supra*, 366 U.S. at p. 426 [6 L.Ed.2d at p. 399]; *Gould* v. *Grubb, supra*, 14 Cal.3d at p. 670.)

As in *Salyer*, the Legislature could reasonably have concluded that providing landowners with a voice in Sierra's affairs was necessary to create the district at all. (410 U.S. at p. 731 [35 L.Ed.2d at p. 668].) Landowners bear the weight of financial responsibility for Sierra. No doubt Sierra residents are affected by the district's provision of domestic water and sewer services. But so too are landowners, including nonresident landowners. (See *Johnson* v. *Lewiston Orchards Irr. Dist., supra*, 584 P.2d at p. 650.) The present legislative electoral scheme attempts to accomodate these interests. Taken together, the newly limited nature of Sierra, the seasonal inhospitability of Sierra's climate, and the district's current primary status as a vacation home community, could rationally have led the Legislature to conclude that enfranchising Sierra's nonresident landowners was reasonable in this case. Furthermore, it is conceivable the present electoral scheme was deemed a reasonable way to thwart a monopoly of power by the developer of the district or its successor; this landowner owns about 85 percent of the total acreage in Sierra. (See *Burrey* v. *Embarcadero Mun. Improvement Dist., supra*, 5 Cal.3d at pp. 682-684.)

We conclude, therefore, that AB 3548's enfranchisement of Sierra's nonresident landowners does not unconstitutionally dilute the votes of Sierra's residents in contravention of the equal protection guaranties of the California and federal Constitutions.

Plaintiffs raise other examples of allegedly disparate and inequitable treatment of voters created by AB 3548. Plaintiffs note that all residents of a household can vote but only one nonresident landowner per parcel holds the franchise. And plaintiffs question the failure to have landowner voting distributed per land value instead of per parcel. These examples, however, are provided without any argument or authority other than to note *Hadley*'s admonition that ". . . whenever a state or local government de-

cides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election . . . ." (397 U.S. at p. 56 [25 L.Ed.2d at pp. 50-51].) Of course, the governmental entity in *Hadley* was deemed to be one of general governmental power mandating a popular election in accord with the "one person, one vote" principle of *Reynolds*. (*Id.* at pp. 53-54 [25 L.Ed.2d at p. 49].) For the reasons expressed previously, Sierra is not such an entity. Accordingly, plaintiffs have not provided any argument or authority for these additional issues of allegedly disparate and inequitable treatment and, on that basis, we decline to consider them. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712]; see generally, 9 Witkin, Cal. Procedure, *supra*, Appeal, § 479, at pp. 469-471.)

■ Nevertheless, we do consider one additional equal protection point raised by plaintiffs that provides the basis for several of their examples of disparity. Plaintiffs argue that the definition of a "resident" voter is rendered ambiguous by the following language in section 30700.6: "*Notwithstanding Section 30021 or any other provision of the law*, qualified voters at elections for directors or otherwise in [Sierra] shall be (1) voters who are residents of the district, . . ." (Italics added.) Section 30021 is the general law providing for resident voting in county water districts and states: " 'Elector,' 'voter,' and 'precinct board' have respectively the same meaning as in the Elections Code, but an 'elector' or 'voter' shall also be a resident of the district or proposed district involved."

Basically, plaintiffs contend the "Notwithstanding" introductory clause of section 30700.6 untethers the term "resident" from any definitional mooring, opening a Pandora's box of which residents are qualified to vote. For example, question plaintiffs, can minors who reside in Sierra now vote? We do not see the parade of complications that plaintiffs do. As we must, we read the statutes in a harmoninizing fashion. (See 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 94, pp. 146-147.) Under such a reading, the "Notwithstanding" clause does not affect the standard applicable definition of a "resident" but merely excepts Sierra from the general county water district electoral principle of resident-only voting (see § 30021); this exception is required because Sierra's electoral scheme is a combination of resident *and* landowning nonresident voting. Two factors further support this conclusion. First, the "Notwithstanding" clause was made a part of the original section 30700.6 that transformed Sierra into a landowner-only voting scheme. (Stats. 1969, ch. 100, § 1 p. 221.) Second, the amended section 30700.6 under AB 3548 states that qualified voters in Sierra shall include "*voters* who are residents of the district" and does not

specify simply "residents of the district." (Italics added; see also AB 3548, § 3.)

Plaintiffs worry that our holding in this sphere of equal protection will set a precedent whereby small governmental entities around the state will now enfranchise nonresident landowners. According to plaintiffs, this will turn the "one person, one vote" principle upside down. We emphasize that our holding is confined to AB 3548, an expressly declared special law applicable only to Sierra. We have previously noted the unique characteristics of Sierra—among them, the disproportionate current number of nonresident landowners, the two-decade history of landowner-only voting, the climatic extremes, the curtailment of authorized governmental powers, and the substantial interest of both residents and nonresident landowners. We have also explained why the "one person, one vote" popular election principle is inapplicable here. The precedential value of this case is therefore limited given these unique characteristics and the case-by-case analysis required of the nature, purpose, and powers of each "special law" governmental entity at issue.

4. *AB 3548 Does Not Violate Article I, Section 22, or Article II, Sections 1 Through 3, of the California Constitution*

Article I, section 22 of the California Constitution provides: "The right to vote or hold office may not be conditioned by a property qualification."

■ Plaintiffs contend that AB 3548's enfranchisement of nonresident landowners violates this constitutional provision. We disagree. A number of California Supreme Court decisions have held that this provision refers to qualifications of electors in ordinary elections involving governmental entities of general powers and is not violated by a statute permitting only landowners to participate in special district elections. (See, e.g., *Barber* v. *Galloway* (1924) 195 Cal. 1, 11-12 [231 P. 34]; *Tarpey* v. *McClure* (1923) 190 Cal. 593, 606 [213 P. 983]; *People* v. *Sacramento Drainage Dist.* (1909) 155 Cal. 373, 389 [103 P. 207]; *People* v. *Reclamation Dist. No. 551* (1897) 117 Cal. 114, 123-124 [48 P. 1016].)

*Tarpey* did note that a case upon which plaintiffs rely—*In re Madera Irr. Dist.* (1891) 92 Cal. 296, 321 [28 P. 272]—used language strongly intimating that California Constitution article I, section 24 (now substantively found in art. I, § 22) and California Constitution article II, section 1 (now substantively found in art. II, § 2—see below) prohibited landowner-only voting and nonresident voting for an irrigation district. (190 Cal. at p. 606.) But *Tarpey* also noted: ". . . it is now clear, in the light of the later decisions, that those provisions of the constitution [article 1, section 24; and article II,

section 1] 'refer to the qualification of electors entitling them to vote at the ordinary elections, local and general, held in the course of the usual functions of civil government.' [Citations.]" (*Ibid.*) Although Sierra may not be as limited a district as some of the special districts in these Supreme Court decisions, for the reasons previously detailed Sierra is not a governmental entity of general powers. Accordingly, the case before us falls within the wrap of these high court decisions. Also noteworthy is that article I, section 22 is directed at the *curtailment* of the franchise on the arbitrary grounds of property ownership. Here, as we have seen, AB 3548 *expands* the franchise and encompasses a considered and supportable recognition of property ownership. Finally, AB 3548's amendment of section 30700.6 to allow Sierra's *nonlandowner* residents, like plaintiff Bjornestad, to vote and hold office is the very provision rendering article I, section 22 inoperative here.

▪ Plaintiffs also claim that AB 3548 violates article II, sections 1 through 3, of the California Constitution by (1) redefining the term "resident" for voting purposes through section 30700.6's introductory "Notwithstanding" clause, and (2) allowing the legal representative of a corporation or an estate owning land in Sierra to vote.

Article II, sections 1 through 3, provide: "Section 1. All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require.

"Section 2. A United States citizen 18 years of age and resident in this state may vote.

"Section 3. The Legislature shall define resident and provide for registration and free elections."

As explained earlier, the introductory "Notwithstanding" clause of section 30700.6 does not redefine the term "resident" for voting purposes.

As for the issue of corporation or estate voting, plaintiffs argue that California Constitution article II, sections 1 through 3, limit the franchise to people who are citizens and reside in California. Consequently, the argument goes, corporations and estates do not satisfy these constitutional principles. Of course, the problem for plaintiffs is that these constitutional provisions " 'refer to the qualification of electors entitling them to vote at the ordinary elections, local and general, held in the course of the usual functions of civil government.' " (*Tarpey* v. *McClure, supra,* 190 Cal. at p. 606, quoting *Wheeler* v. *Herbert* (1907) 152 Cal. 224, 232 [92 P. 353].) Sierra is not a governmental entity of general purpose and powers and

therefore these constitutional provisions are inapplicable.[8] Bolstering our conclusion is the fact that landowning corporations were entitled to vote in the contexts presented in *Burrey* (5 Cal.3d at pp. 675, 679), *Curtis v. Board of Supervisors, supra*, 7 Cal.3d at page 963, and *Schindler v. Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831, 839 [82 Cal.Rptr. 61], and none of these cases mentioned any constitutional infirmity in this regard. (Accord, *Salyer Land Co. v. Tulare Water District, supra*, 410 U.S. 719 [maj. opn.].)

## 5. *The Issue of Attorney Fees*

At the conclusion of the pre-AB 3548 section 30700.6 litigation below, the trial court made the following order regarding attorney fees: "Pursuant to 42 U.S.C. § 1988, and Code of Civil Procedure section 1021.5, [plaintiffs] shall be entitled to their attorneys' fees and costs from [Sierra]. In the event the parties are unable to agree upon the amount of the fees, the issue may be submitted on a declaration filed with this Court. . . ." Trial court resolution of the attorney fees issue was subsequently deferred pending this appeal.

Through AB 3548, the Legislature obviously recognized the merits of plaintiffs' contention that Sierra residents are entitled to vote in Sierra elections and be members of Sierra's governing body. As noted in *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288 [221 Cal.Rptr. 746]: "Case law takes a pragmatic approach in defining 'prevailing' or 'successful' party within the meaning of [Code of Civil Procedure] section 1021.5. 'The critical fact is the impact of the action,' in achieving the desired result, not 'the manner of its resolution.' [Citations.] The impact might include legislative changes, settlements, or amendments in policy." (176 Cal.App.3d at p. 314.) We remand this matter to the trial court to determine the amount of attorney fees, if any, plaintiffs are entitled to for their trial court litigation regarding pre-AB 3548 section 30700.6.

Plaintiffs have also requested attorney fees for this appeal. Pursuant to our remand, the trial court is also to determine if plaintiffs are entitled to any attorney fees for their efforts on appeal. This appeal encompasses not only the present proceedings remanded from the Supreme Court but the previous appeal to this court upon which the Supreme Court based its remand order; if plaintiffs are entitled to any such attorney fees on appeal, the trial court is also to determine the amount of those fees. (See *Sagaser v.*

---

[8]Plaintiffs claim that *Burrey* questioned the continuing validity of *Tarpey* and similar cases. The court in *Burrey*, however, stated it had no need to comment upon the continuing validity of these cases. (5 Cal.3d at p. 677, fn. 6.) In any event, *Burrey*'s concern had to do with the determinations in these cases that special districts with landowner-only voting were not holding "elections" per se; *Burrey* did not question the conclusion in these cases that the subject constitutional provisions at issue here refer to the qualification of electors for ordinary elections involving governmental entities with general powers. (*Ibid.*)

*McCarthy, supra,* 176 Cal.App.3d at pp. 313-315.) The critical question regarding the award of attorney fees to plaintiffs on appeal is whether the persistence of plaintiffs affected the Legislature's decision to enfranchise Sierra's residents and curtail Sierra's authorized powers; if so, under Code of Civil Procedure section 1021.5 plaintiffs are entitled to the attorney fees on appeal attributable to those efforts. (*Id.* at p. 315.)

## DISPOSITION

Under AB 3548, Sierra does not constitute a special limited purpose district whose activities disproportionately affect landowners as a group. Consequently, the five present Sierra director positions—all of which were elected pursuant to the pre-AB 3548 landowner-only voting scheme—will have to be the subject of a special election. In this regard, subdivision (e) of section 30700.6 is unconstitutional but severable from the rest of AB 3548. AB 3548's enfranchisement of Sierra's nonresident landowners does not unconstitutionally dilute the votes of Sierra's residents in contravention of the equal protection guaranties of the California and federal Constitutions. Nor does the electoral scheme of AB 3548 violate article I, section 22, or article II, sections 1 through 3, of the California Constitution, by enfranchising nonresident landowners and the legal representatives of corporations or estates which own land in Sierra. We remand this matter to the trial court to structure a special election for the Sierra board of directors in accord with the dictates of AB 3548. We also remand the matter to the trial court for it to determine the issues regarding attorney fees at the trial and the appellate levels as delineated in this opinion in section 5 of the Discussion. Plaintiffs are awarded their costs on appeal.[9]

Carr, Acting P. J., and Marler, J., concurred.

A petition for a rehearing was denied June 19, 1991, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 29, 1991.

---

[9] Consistent with the views expressed in this opinion, the trial court will also have to address plaintiffs' postelection challenge to the Sierra directors elected at the November 1989 election. (Placer County Super. Ct. No. 87755.)