Filed 9/9/16 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


FIRST APPELLATE DISTRICT


DIVISION FIVE


| | |
|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BAY AREA AIR QUALITY MANAGEMENT DISTRICT,<br><br>     Defendant and Appellant. | A135335 & A136212<br><br>(Alameda County<br>Super. Ct. No. RG10548693)<br><br><br>ORDER MODIFYING OPINION<br> AND DENYING REHEARING<br> **[NO CHANGE IN JUDGMENT]** |

The petition for rehearing, filed August 25, 2016, is denied, as is the accompanying request for judicial notice.

It is ordered that the opinion filed herein on August 12, 2016, which was certified for publication, be modified as follows:

1. On page 13 of the slip opinion, at the end of the only paragraph under Section C. of the Discussion, the following sentence is added:

District's suggestion that local agencies could impose such a requirement by virtue of their police powers, if not under CEQA, raises an issue not properly before us because this case concerns only the scope of environmental review under CEQA.

2.  On page 19 of the slip opinion, in the first full paragraph under Section D.5. of the Discussion, the citation to *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 172–174, is modified to read:

*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 172–174 (*Pacific Legal Foundation*).

The parenthetical language in brackets following the citation is not affected.

3.  On page 20 of the slip opinion, following the last paragraph in Section E. of the Discussion, the following paragraphs are added:

In a petition for rehearing, District argues writ relief is inappropriate because the District Guidelines are a nonbinding, advisory document and their review is premature given the lack of a specific controversy.  We are not persuaded.

District relies on inapposite case law in which the courts declined to use the remedy of mandamus to set aside interim actions by an agency during a multilayered review process.  (*California High-Speed Rail Authority v. Superior Court* (2014) 228 Cal.App.4th 676, 708–713 [no present duty to redo preliminary funding plan]; *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1486 [water assessment report providing information to be included in EIR was not final determination as necessary to obtain relief by mandamus].)  The District Guidelines are not interim steps in a larger review process; rather, they are interpretive guidelines for CEQA analyses promulgated by an air district that acts as either the lead agency or a responsible agency on projects within its jurisdictional boundaries.

For purposes of assessing the propriety of a writ of mandate, the District Guidelines are akin to the guidelines issued by the California Coastal Commission and challenged in *Pacific Legal Foundation*, *supra*, 33 Cal.3d at page 163.  Those guidelines, though not binding on any agency, explained the Commission's interpretation of the public beach access provisions of the Coastal Act, and were asserted to be invalid on their

2

face because they required property owners to dedicate easements giving beach access to the public as a condition of obtaining permit approval for proposed developments. Noting that the promulgation of the access guidelines was a quasi-legislative act reviewable by an action for declaratory relief or traditional mandamus (as opposed to administrative mandamus), the court went on to consider whether a ripe controversy existed. (*Id*. at p. 169.)

Turning to the question of whether the challenge to the Coastal Commission's guidelines was ripe, the court applied a standard used by the federal courts and considered " 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " (*Pacific Legal Foundation*, *supra*, 33 Cal.3d at p. 171, italics omitted.) It concluded the facial challenge to the guidelines was not ripe: "Although it may be predicted with assurance that some of the plaintiff landowners will eventually wish to make improvements on their property, it is sheer guesswork to conclude that the Commission will abuse its authority by imposing impermissible conditions on any permits required. The guidelines are not mandatory. *They do not require the Commission to impose access conditions in any particular circumstances, but rather adopt a flexible approach: the Commission is to determine the appropriateness of access exactions on a case-by-case basis*." (*Id*. at p. 174, italics added.)

Unlike the Coastal Commission guidelines at issue in *Pacific Legal Foundation*, the District Guidelines do not call for the Receptor Thresholds to be applied to projects on a case-by-case basis. Instead, they suggest a routine analysis of whether new receptors will be exposed to specific amounts of toxic air contaminants. Given the clarity of the Supreme Court's decision that such an analysis oversteps the bounds of CEQA except in specified circumstances (*Building Association*, *supra*, 62 Cal.4th at p. 392), the issue is fit for judicial determination. The ripeness requirement "should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread pubic interest in the

answer to a particular legal question." (*Pacific Legal Foundation*, *supra*, 33 Cal.3d at p. 170.)

The modification effects no change in judgment.

Date: _____                                        _____

Needham, Acting P.J.

4

Superior Court of Alameda County, No. RG10-548693, Frank Roesch, Judge.

Shute, Mihaly & Weinberger, Ellison Folk, Erin B. Chalmers and Brian C. Bunger for Defendant and Appellant.

Ruby R. Fernandez for South Coast Air Quality District as Amicus Curiae on behalf of Defendant and Appellant.

Paula A. Forbis for County of San Diego as Amicus Curiae on behalf of Defendant and Appellant.

Matthew D. Vespa for Sierra Club and Center for Biological Diversity as Amicus Curiae on behalf of Defendant and Appellant.

Burke, Williams & Sorensen and Thomas B. Brown for League of California Cities and California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

Cox, Castle & Nicholson, Andrew B. Sabey, Christian Cebrian, Michael H. Zischke and Bradley B. Brownlow for Plaintiff and Respondent.

Perkins Coie and Geoffrey L. Robinson for Center for Creative Land Recycling as Amicus Curiae on behalf Plaintiff and Respondent.

Filed 8/12/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION, <br><br>      Plaintiff and Respondent, <br><br> v. <br><br> BAY AREA AIR QUALITY MANAGEMENT DISTRICT, <br><br>      Defendant and Appellant. | A135335 & A136212 <br><br> (Alameda County <br> Super. Ct. No. RG10548693) |

The California Environmental Quality Act (CEQA; Pub. Res. Code, § 21000 et seq.) requires public agencies to conduct an environmental review of discretionary projects they carry out or approve and to prepare an environmental impact report (EIR) for any project that may have a significant effect on the environment. (Pub. Res. Code, §§ 21151, 21100, 21080, 21082.2.) The CEQA Guidelines[1] encourage public agencies to develop and publish "thresholds of significance" to assist in determining whether a project's effect will be deemed significant. (CEQA Guidelines, § 15064.7.) "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which mean the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (*Id*., subd. (a).)

---

[1] References to the CEQA Guidelines are to the regulations for the implementation of CEQA codified in Title 14, section 15000 et seq. of the California Code of Regulations, which have been developed by the Office of Planning and Research and adopted by the Secretary of the California Natural Resources Agency. (Pub. Res. Code, § 21083.)

1

Following a grant of review of our previous opinion in this case, the Supreme Court held CEQA "does not generally require an agency to consider the effects of existing environmental conditions on a proposed project's future users or residents." (*California Building Industry Assn. v. Bay Area Air Quality Management District* (2015) 62 Cal.4th 369, 392 (*Building Association*).) It remanded the case to this court to consider whether thresholds of significance adopted by appellant Bay Area Air Quality Management District (District) ran afoul of this principle and the extent to which respondent California Building Industry Association (CBIA) was entitled to relief. (*Id*. at pp. 392–393.) We conclude the challenged thresholds are not invalid on their face, but may not be used for the primary purpose envisioned by District, namely, to routinely assess the effect of existing environmental conditions on future users or occupants of a project.

## I. BACKGROUND

### A. *The Thresholds and District Guidelines*

District is a regional agency charged with limiting nonvehicular air pollution in the San Francisco Bay Area. It is authorized to adopt and enforce rules and regulations regarding the emission of pollutants, and to ensure state and federal ambient air quality standards are met. (Health & Saf. Code, §§ 39002, 40000, 40001, subd. (a), 40200.) Among its other activities, District monitors air quality, engages in public outreach campaigns, issues permits to certain emitters of air pollution, and promulgates rules to control emissions. (Health & Saf. Code, §§ 42300, 42301.5, 42315.)

In 1999, District published thresholds of significance concerning certain air pollutants, along with guidelines concerning their use and the analysis of air quality issues, in general, under CEQA. District's 1999 thresholds and guidelines were intended to serve as a guide for those who prepare or evaluate air quality impact analyses for projects and plans in the San Francisco Bay Area, and set forth the levels at which toxic air contaminants (TACs) and certain types of particulate matter would be deemed environmentally significant.

2

In 2009, District drafted new proposed thresholds of significance, partly in response to the Legislature's adoption of laws addressing greenhouse gases (GHGs). It cited three factors justifying the new thresholds: (1) the enactment of more stringent state and federal air quality standards since the adoption of the earlier thresholds and the addition of $PM_{2.5}$ (particulate matter with a diameter of 2.5 microns or less) to the substances regulated; (2) the discovery that TACs present an even greater health risk than previously thought; and (3) the growing concern with global climate change.

A number of organizations, businesses, and local governments participated in public hearings, meetings, and workshops held by District regarding the proposed revisions. One participant was CBIA, a statewide trade organization representing members involved in residential and light commercial construction, including homebuilders, architects, trade contractors, engineers, designers, and other building industry professionals. During the public hearing process, CBIA and other groups expressed concern the proposed thresholds and guidelines were too stringent and would make it difficult to complete urban infill projects close to existing sources of air pollution. According to these groups, EIRs would be required for many projects where they otherwise would not have been, and other projects would not be approved. If these infill projects were not feasible, they argued, developers would build in more suburban areas, thus (paradoxically) causing even more pollution due to automobile commuter traffic.

On June 2, 2010, District's board of directors passed resolution No. 2010-06 (Resolution), adopting new thresholds of significance for air pollutants, including GHGs, TACs and $PM_{2.5}$ (the Thresholds). As set forth in the Resolution, the Thresholds "reflect the levels at which environmental effects should be considered 'significant' for purposes of CEQA, such that exceedance of the [T]hresholds will normally establish that the effect is 'significant' under CEQA and compliance with the [T]hresholds normally will establish that the effect is less than 'significant' under CEQA[.]"

The Thresholds, which were attached as Exhibit A to the Resolution, set "construction-related" and "operational-related" significance levels for TACs and $PM_{2.5}$

3

emissions, broken down into four separate categories: (1) "Risks and Hazards—New Source (Individual Project);" (2) "Risks and Hazards—New Receptor (Individual Project);" (3) "Risks and Hazards—New Source (Cumulative Thresholds);" and (4) "Risks and Hazards—New Receptor (Cumulative Thresholds)." Relevant to this case are the significance levels applicable to a new receptor (Receptor Thresholds), as to which the Resolution states, "[I]t is the policy of the [District] that Lead agencies in the Bay Area apply the CEQA Thresholds of Significance for the Risk and Hazard thresholds for Receptor Projects for Notices of Preparation issued, and environmental analyses begun, after January 1, 2011."[2]

Also in 2010, District published new "CEQA Air Quality Guidelines" (District Guidelines), which include the Thresholds and suggest methods of assessing and mitigating impacts found to be significant. The self-stated purpose of these District Guidelines "is to assist lead agencies in evaluating air quality impacts of projects and plans proposed in the San Francisco Bay Area Air Basin (SFBAAB). The [District] Guidelines provide[] [District]-recommended procedures for evaluating potential air quality impacts during the environmental review process consistent with CEQA requirements. . . . [¶] Land development plans and projects have the potential to generate harmful air pollutants that degrade air quality and increase local exposure. The [District] Guidelines contain instructions on how to evaluate, measure, and mitigate air quality impacts generated from land development construction and operation activities. The [District] Guidelines focus on criteria air pollutant, greenhouse gas (GHG), toxic air

---

[2]     The Receptor Thresholds set significance levels for the future occupants of a project if, within a 1,000-foot zone of influence: (1) the targeted emissions exceed compliance with a qualified community risk reduction plan; (2) the cumulative emissions from all sources of specified pollutants expose those occupants to an increased cancer risk greater than 100 in a million, or the emissions from a single source expose those occupants to an increased cancer risk greater than 10 in a million; or (3) there is an incremental annual average increase of more than 0.3 microgram of $PM_{2.5}$ per cubic meter from a single source or 0.8 microgram per cubic meter from all sources. The same measures of significance were set for new sources of emissions (the Source Thresholds, which are not challenged by CBIA).

4

contaminant, and odor emissions generated from plans or projects.  [¶]  The [District] Guidelines are intended to help lead agencies navigate the CEQA process.  The [District] Guidelines offer step-by-step procedures for a thorough environmental analysis of adverse air emissions due to land development in the Bay Area."  (District Guidelines, [¶] 1.1.)

Paragraph 5.2 of the District Guidelines directs the lead agency to "determine whether operational-related TAC and $PM_{2.5}$ emissions generated as part of a proposed project siting a new source or receptor would expose existing or new receptors to levels that exceed [the District's] applicable *Thresholds of Significance . . . .*"  Paragraph 5.2.5 of the District Guidelines, entitled "Siting a New Receptor," states:  "If a project is likely to be a place where people live, play, or convalesce, it should be considered a receptor.  It should also be considered a receptor if sensitive individuals are likely to spend a significant amount of time there. . . . Examples of receptors include residences, schools and school yards, parks and play grounds, daycare centers, nursing homes, and medical facilities. . . .  [¶]  When siting a new receptor, a Lead Agency shall examine existing or future proposed sources of TAC and/or $PM_{2.5}$ emissions that would adversely affect individuals within the planned project.  A Lead Agency shall examine:  [¶] • the extent to which existing sources would increase risk levels, hazard index, and/or $PM_{2.5}$ concentrations near the planned receptor, [¶] • whether the existing sources are permitted or non-permitted by [the District], and [¶] • whether there are freeways or major roadways near the planned receptor.  [¶]  [The District] recommends that a Lead Agency identify all TAC and $PM_{2.5}$ sources located within a 1,000 foot radius of the proposed project site . . . ."

B. *CBIA's Petition for Writ of Mandate and Complaint for Declaratory Relief*

On November 29, 2010, CBIA filed a petition for writ of mandate and complaint for declaratory relief challenging the Thresholds.  (Code Civ. Proc., §§ 1060, 1085; Pub. Res. Code, § 21168.5.)  The trial court conducted a hearing on the merits of the following claims:  (1) District should have conducted a CEQA review of the Thresholds before their promulgation because they constitute a "project" within the meaning of CEQA; (2) the

5

Receptor Thresholds were arbitrary and capricious to the extent they required an evaluation (impermissible under CEQA) of the impacts the environment would have on a given project; (3) aspects of the Thresholds were not based on substantial evidence; and (4) the Thresholds failed the "rational basis" test because sufficient evidence did not exist for their approval.  Following a hearing, the court agreed District should have conducted an environmental review under CEQA before issuing the Thresholds and issued a writ of mandate directing District to set aside its approval of the Thresholds.  The court awarded CBIA attorney fees under Code of Civil Procedure section 1021.5.

C.  *District's Appeal*

District appealed the order granting the writ and the award of attorney fees, arguing the Thresholds were not a project requiring a CEQA review prior to their promulgation.  We agreed and reversed the order granting the writ.  We also rejected CBIA's defensive challenges to the sufficiency of the evidence supporting the Thresholds, as well as CBIA's argument that the Receptor Thresholds should be set aside because the purpose of CEQA was to protect the environment from proposed projects, not to protect the future occupants or users of proposed projects from the environment. (See *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473; *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1612–1616; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 905; *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468.)

With respect to this last issue, we declined to resolve whether, as a general rule, an EIR may be required solely because an existing project may adversely affect future users or occupants of a project.  We found the issue was better reserved for a case in which the Receptor Thresholds had actually been applied to a project, and concluded the Receptor Thresholds were not invalid on their face because there were circumstances in which they could be utilized even if, as a general rule, CEQA did not require an analysis of the effect the existing environment would have upon future occupants or users.  We also reversed the trial court's award of attorney fees, finding CBIA was no longer a successful party

6

under Code of Civil Procedure section 1021.5. (*Building Association*, *supra*, 62 Cal.4th at p. 393.)

D. *Supreme Court Decision on Grant of Review*

CBIA filed a petition for review on the following issues: (1) whether CEQA requires an analysis of the impacts of the existing environment upon a project; (2) whether CEQA established a "blanket exemption" from environmental review for an agency's adoption of a rule, regulation or ordinance of general application adopted as a threshold of significance; and (3) whether CEQA applied a heightened evidentiary burden to the question of whether an activity is a project when the potential environmental change involves displaced development. The Supreme Court granted the petition in part, limiting the scope of review to the question: "Under what circumstances, if any, does CEQA require an analysis of how existing environmental conditions will impact future residents or users (receptors) of a proposed project?" (*Building Association*, *supra*, 62 Cal.4th at p. 381.)

In the proceedings before the Supreme Court on review, District took the position that "when existing environmental conditions on or near the proposed project site pose hazards to humans brought to the site by the project, the project may have potentially significant environmental effects requiring evaluation." (*Building Association*, *supra*, 62 Cal.4th at p. 386.) CBIA took the "contrasting view" that the relevant consideration when determining the need for an EIR was the project's effect on the environment, not the environment's effect on the project. (*Ibid*.) In its opinion, the Supreme Court agreed with CBIA as a general matter: "In light of CEQA's text and structure, we conclude that CEQA generally does not require an analysis of how existing environmental conditions will impact a project's future users or residents." (*Building Association*, *supra*, 62 Cal.4th at p. 386.)

In reaching this conclusion, the Supreme Court acknowledged District's argument that CEQA is concerned with public health and safety, and requires a finding of " ' "a significant effect on the environment" ' ([Pub. Res. Code,] § 21083(b)) whenever the 'environmental effects of a project will cause substantial adverse effects *on human*

7

*beings*, either directly or indirectly.' ([Pub. Res. Code], § 21083(b)(3).)" (*Building Association*, *supra*, 62 Cal.4th at p. 387.) But the District's reading of this language "goes too far. . . . The statute does not provide enough of a basis to suggest that the term 'environmental effects' as used in this context is meant, as a general matter, to encompass these broader considerations associated with the health and safety of a project's future residents or users. [Public Resources Code s]ection 21060.5 defines 'environment' as 'the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' ([Pub. Res. Code,] § 21060.5.) Given the text of [Public Resources Code] section 21083 and other relevant provisions of the statutory scheme to which it belongs—including CEQA's statute-wide definition of 'environment'—the phrase in question is best interpreted as limited to those impacts on a project's users or residents that arise from the project's effects on the environment. Even if one reads into CEQA's definition of 'environment' a concern with people—a reading that, notwithstanding [Public Resources Code] section 21060.5, is conceivable given the Legislature's interest in public health and safety—[Public Resources Code] section 21083 does not contain language directing agencies to analyze the environment's effects *on* a project. Requiring such an evaluation *in all circumstances* would impermissibly expand the scope of CEQA." (*Building Association*, at p. 387, italics added.)

The Supreme Court continued: "The rest of the statute's relevant provisions underscore why. Despite the statute's evident concern with protecting the environment and human health, its relevant provisions are best read to focus almost entirely on how projects affect the environment. (E.g., [Pub. Res. Code,] §§ 21060.5 [defining environment], 21068 [' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment'], 21083(b)(1) [directing that a project shall be found to have a ' "significant effect on the environment" ' if it 'has the potential to degrade the quality of the environment'].) Indeed, the key phrase 'significant effect on the environment' is explicitly defined by statute in a manner that does not encompass the environment's effect on the project. (§ 21068 [' "Significant effect on the

8

environment" means a substantial, or potentially substantial, adverse change in the environment.'].) And nowhere in the statute is there any provision that cuts against the specificity of that definition by plainly delegating power for the agency to determine whether a project must be screened on the basis of how the environment affects its residents or users." (*Building Association*, *supra*, 62 Cal.4th at p. 387.)

The court then turned its attention to CEQA Guidelines section 15126.2(a), cited by District in support of its position that CEQA requires a consideration of the environment's effect upon future users of a project. CEQA Guidelines section 15126.2(a) "calls for an EIR to 'identify and focus on the significant environmental effects of the proposed project,' including 'any significant environmental effects the project might cause *by bringing development and people into the area affected.*' (Italics added.)" (*Building Association*, *supra*, 62 Cal.4th at p. 385.) It further states: "[A]n EIR [should] evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas.' " (CEQA Guidelines, § 15126(a).)

The Supreme Court found valid the above-quoted portions of CEQA Guidelines section 15126(a) "to the extent they call for evaluating a project's potentially significant *exacerbating* effects on existing environmental hazards . . . . " (*Building Association*, *supra*, 62 Cal.4th at p. 388.) "Because this type of inquiry still focuses on the *project's impacts on the environment*—how a project might worsen existing conditions—directing an agency to evaluate how such worsened conditions could affect a project's future users or residents is entirely consistent with this focus and with CEQA as a whole." (*Id*. at p. 389.) But the Court found two additional sentences contained in CEQA Guidelines section 15126.2(a) to be "clearly erroneous and unauthorized under CEQA: '[A]n EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing them to the hazards found there.' " (*Building Association*, *supra*, 62 Cal.4th at p. 390.) These two sentences—which

9

described a project that would not itself exacerbate the hazard, but whose occupants might be jeopardized by existing conditions—"impos[ed] a requirement too far removed from evaluating a project's impacts on the environment." (*Ibid.*)

The Supreme Court recognized statutory exceptions to the general rule that CEQA does not require an analysis of the environment's effects upon a project. "Although CEQA does not generally require an evaluation of the effects of existing hazards on future users of the proposed project, it calls for such an analysis in several specific contexts involving certain airport (§ 21096) and school construction projects (§ 21151.8), and some housing development projects (§§ 21159.21, subds. (f), (h), 21159.22, subds. (a), (b)(3), 21159.23, subd. (a)(2)(A), 21159.24, subd. (a)(1), (3), 21155.1, subd. (a)(4), (6))." (*Building Association*, *supra*, 62 Cal.4th at p. 391.) These provisions "constitute specific exceptions to CEQA's general rule requiring consideration only of a project's effect on the environment, not the environment's effects on project users. Accordingly, we cannot, as the District urges, extrapolate from these statutes an overarching, general requirement that an agency analyze existing environmental conditions whenever they pose a risk to the future residents or users of a project." (*Id.* at p. 392.)

Having clarified that CEQA "does not generally require an agency to consider the effects of existing environmental conditions on a proposed project's future users or residents" but does mandate "an analysis of how a project might exacerbate existing environmental hazards" (*Building Association*, *supra*, 62 Cal.4th at p. 392), the Supreme Court remanded the case to us to "address certain potentially important arguments for and against [CBIA's petition for writ relief] in light of CEQA's requirements . . . ." as it had interpreted them. (*Id.* at pp. 392–393.) We now consider the validity of the Receptor Thresholds in light of the Supreme Court's decision in *Building Association*, and the relief, if any, to which CBIA is entitled with respect to those thresholds.

## II. DISCUSSION

A. *CEQA Review and Thresholds of Significance—General Principles*

" 'CEQA embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." ' [Citations.] To

10

implement this policy, CEQA and the Guidelines issued by the State Resources Agency have established a three-tiered process. [Citation.] In the first step, an agency conducts a preliminary review to determine whether CEQA applies to a proposed activity. [Citation.] If the project is exempt from CEQA, either because it is not a 'project' as defined in section 15378 of the Guidelines or because it falls within one of several exemptions to CEQA, 'no further environmental review is necessary. The agency may prepare and file a notice of exemption, citing the relevant section of the Guidelines and including a brief 'statement of reasons to support the finding.' [Citation.] If, however, the project does not fall within any exemption, the agency must proceed with the second tier and conduct an initial study. [Citation.] If the initial study reveals that the project will not have a significant environmental effect, the agency must prepare a negative declaration, briefly describing the reasons supporting the determination. [Citations.] Otherwise, the third step in the process is to prepare a full environmental impact report (EIR) on the proposed project.' " (*San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1019–1020.)

Under CEQA Guidelines section 15064.7, "(a) Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant. [¶] (b) Thresholds of significance to be adopted for general use as part of the lead agency's environmental review process must be adopted by ordinance, resolution, rule, or regulation, and developed through a public review process and be supported by substantial evidence." Such thresholds may be employed at various stages of CEQA review, but are not determinative and "cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be

11

significant." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.)

      B. *Standard of Review*

      "Any statute, local ordinance or regulation that conflicts with state law is invalid and preempted." (*Mountains Recreation Conservation Authority v. Kaufman* (2011) 198 Cal.App.4th Supp. 1, 5.) CBIA argues the Receptor Thresholds are invalid because they require agencies to consider the effect of existing environmental conditions upon future users and occupants of proposed projects, contrary to the Supreme Court's holding in *Building Association* that "CEQA does not require an agency to consider the impact of existing conditions on future project users" except for certain airport, school and housing development projects. (*Building Association*, *supra*, 62 Cal.4th at p. 378.) Questions concerning the interpretation or application of CEQA, and the consistency of local regulations with CEQA, are matters of law subject to de novo or independent review. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1375; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 109–110 (*CBE*), disapproved on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3; see *PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1305.).

      C. *A Lead Agency Cannot Require an EIR or Mitigation Measures Based Solely on a Determination a Project Will Have a Significant Effect Upon a New Receptor*

      District acknowledges in its brief on remand that the Receptor Thresholds "provide public agencies with a standard by which to determine whether future project residents or users will be exposed to an unacceptable health risk because the project will be located near a source of toxic air pollution." As the Supreme Court made clear in *Building Association*, CEQA does not generally require an agency to consider the effects of existing environmental conditions on a proposed project's future users or occupants. (*Building Association*, *supra*, 62 Cal.4th at p. 392.) Consistent with *Building*

12

*Association*, a lead agency could not require the preparation of an EIR, other CEQA review, or the implementation of mitigation measures for a proposed project solely because the emissions in the existing environment meet the criteria of the Receptor Thresholds as to future users or occupants of the project.

D. *The Receptor Thresholds Have Valid Applications Under Certain Circumstances*

District argues that although "the mere exposure of people to existing hazards [does] not cause an environmental effect requiring analysis under CEQA," the Receptor Thresholds need not be set aside because there are legitimate circumstances in which they could be utilized during the CEQA process. We consider each in turn.

1. Voluntary Use of Receptor Thresholds by an Agency

District contends that while CEQA does not generally require an evaluation of existing conditions upon future occupants or users of a proposed project, a public agency retains the discretion to make such an evaluation when conducting an analysis of its own project. It argues that in such cases, the Receptor Thresholds provide an appropriate measure of existing air pollution. We agree.

In *Building Association*, *supra*, 62 Cal.4th at page 388, the Supreme Court explained that CEQA "does not proscribe consideration of existing conditions" for the purpose of determining whether a proposed project would "exacerbate hazards that are already present." It then noted, "Nor, for that matter, does CEQA *prohibit* an agency from considering—*as part of an environmental review of a project it proposes to undertake*— how existing conditions might impact a project's future users or residents. Indeed, it appears that such an analysis had been widely understood to be an integral aspect of CEQA review for three decades. (OPR: CEQA: The California Environmental Quality Act: Law and Guidelines 1984 (Jan. 1984) Discussion of amendments, [CEQA] Guidelines former § 15126, p. 137 [dismissing as early as 1983 the alleged 'artificial distinction' between examining 'the effects of the project on the environment' and 'the effects of the environment on the project'])." (*Building Association*, *supra*, 62 Cal.4th at p. 388, fn. 12, italics added.)

13

CBIA suggests the Supreme Court's reference to "an environmental review for a project it proposes to undertake" refers to planning and zoning decisions by an agency, rather than CEQA review as contemplated by the Receptor Thresholds. We do not think the Supreme Court would have used the term "environmental review" to mean something other than review under CEQA in a case involving the validity of thresholds of significance under CEQA, particularly when the sentence that follows notes that an analysis of how existing conditions might affect future users and residents "had been widely understood to be an integral aspect of CEQA review for three decades." (*Building Association*, *supra*, 62 Cal.4th at p. 388, fn. 12.) We therefore construe footnote 12 of the *Building Association* decision to mean that while CEQA cannot be used by a lead agency to require a developer or other agency to obtain an EIR or implement mitigation measures solely because the occupants or users of a new project would be subjected to the levels of emissions specified, an agency may do so voluntarily on its own project and may use the Receptor Thresholds for guidance. (See *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 700–701 [county not precluded from arguing it had voluntarily undertaken environmental review not required by CEQA].)

2. Exacerbation of Existing Conditions

District argues the Receptor Thresholds may be applied to any new project to determine whether it would worsen existing conditions and thus affect future users of the project. As the Supreme Court explained in *Building Association*: "[T]he statutory language [of CEQA] emphasizes how the analysis of a project's potential to exacerbate existing conditions is not an exception to, but instead a consequence of, CEQA's core requirement that an agency evaluate a project's impact on the environment. . . . Because this type of inquiry still focuses on the *project's impacts on the environment*—how a project might worsen existing conditions—directing an agency to evaluate how such worsened conditions could affect a project's future users or residents is entirely consistent with this focus and with CEQA as a whole." (*Building Association*, *supra*, 62 Cal.4th at p; 389.)

14

CBIA responds that the Receptor Thresholds are not the appropriate vehicle for measuring the exacerbating effects of a project on the existing environment. When such an analysis is required, CBIA argues, the proposed project is a *source* of environmental contamination, and its effect within the presumptive 1,000-foot zone of influence (including its effect upon persons living in or working at the site of the project itself) would be measured by the Source Thresholds, which are not at issue at this stage of the appeal. We agree that conceptually, a proposed project that would itself worsen environmental conditions would be a source—but it would also be a receptor to the extent it brought users or occupants to the site. The Source Thresholds and Receptor Thresholds are numerically identical, and would presumably yield the same result when applied to a project likely to worsen environmental conditions. But while this might render the Receptor Thresholds *redundant* in certain cases, it does not mean they could not be used as a component in measuring the effects of such a project, as discussed in *Building Association*.

### 3. School Projects under CEQA

The Supreme Court's decision in *Building Association* recognized "[a]lthough CEQA does not generally require an evaluation of the effects of existing hazards on future users of the proposed project, it calls for such an analysis" with respect to certain school projects. (*Building Association*, *supra*, 62 Cal.4th at p. 391.) District correctly argues the Receptor Thresholds could be used by a school district acting as a lead agency to determine such hazards.

Public Resources Code section 21151.8, subdivision (a)(1), provides that an EIR or negative declaration will not be approved for a project involving the purchase of a school site or the construction of a new elementary or secondary school unless those documents include information necessary to determine whether the property is located on certain hazardous sites or within 500 feet from the edge of a freeway or busy traffic corridor. The school district, as the lead agency, must consult with air quality districts and other agencies regarding facilities within one-quarter mile of the proposed school site "that might reasonably be anticipated to emit hazardous emissions or handle hazardous or

15

extremely hazardous substances or waste." (Pub. Res. Code, § 21151.8, subd. (a)(2)(A).) When specified facilities or sources of pollution have been identified, the governing board of the school district must make written findings that "(i) *The health risks from the facilities or other pollution sources do not and will not constitute an actual or potential endangerment of public health to persons who would attend or be employed at the proposed school.* [¶] (ii) Corrective measures required under an existing order by another agency having jurisdiction over the facilities or other pollution sources will, before the school is occupied, *result in the mitigation of all chronic or accidental hazardous air emissions to levels that do not constitute an actual or potential endangerment of public health to persons who would attend or be employed at the proposed school. . . .* [¶] (iii) For a schoolsite with a boundary that is within 500 feet of the edge of the closest traffic lane of a freeway or other busy traffic corridor, the governing board of the school district determines, through analysis pursuant to paragraph (2) of subdivision (b) of Section 44360 of the Health and Safety Code, based on appropriate air dispersion modeling, and after considering any potential mitigation measures, that *the air quality at the proposed site is such that neither short-term nor long-term exposure poses significant health risks to pupils.*" (Pub. Res. Code, § 21151.8, subd. (a)(3)(B)(i)–(iii), italics added.)

The CEQA review of a school project thus requires the school district to consider whether specified existing sources of pollution are an "endangerment of public health" of persons at the school site, whether corrective measures could mitigate this danger, and whether air quality poses "significant health risks" to students. (Pub. Res. Code, § 21151.8, subd. (a)(3)(B)(i)–(iii).) The purpose of the Receptor Thresholds is to determine whether a project will have a significant effect on the environment. A finding of significance is mandatory if "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Pub. Res. Code, § 21083, subd. (b)(3); CEQA Guidelines, § 15065(a)(4).) "In other words, while '[e]ffects analyzed under CEQA must be related to a physical change' ([CEQA] Guidelines, § 15358, subd. (b)), such a change may be deemed *significant* based solely on

16

its impact on people." (*Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 779 (*Parker Shattuck*).)

Although the suggested 1,000-foot zone of influence for the Receptor Thresholds does not correspond precisely to the quarter-mile (1,320-foot) radius within which sources of air pollution must be analyzed by a school district under Public Resources Code section 21151.8, subd. (a)(2)(A), sections 5.1.3 and 5.2.5 of the District Guidelines recognize a lead agency may "enlarge the 1,000-foot radius on a case-by-case basis . . . ." Given the confluence of purpose between measuring environmental significance as contemplated by the Receptor Thresholds, and measuring risks to human health as contemplated by the CEQA requirements for siting a new school, the levels of air pollution described by the Receptor Thresholds could be used by a school district to assess the health risk to students and employees at a proposed school site.[3]

### 4. CEQA Exemptions for Housing Development Projects

The Public Resources Code exempts certain housing development projects from CEQA review when, among other things, "[t]he site of the project is subject to a preliminary endangerment assessment prepared by an environmental assessor to determine the existence of any release of a hazardous substance on the site and *to determine the potential for exposure of future occupants to significant health hazards from any nearby property or activity*." (Pub. Res. Code, §§ 21159.21, subd. (f), italics

---

[3] Another exception to the general rule that CEQA does not require an evaluation of the effects of existing hazards on future users of a project is Pubic Resources Code section 21096 (noted in *Building Association*, *supra*, 62 Cal.4th at p. 391), which describes the procedures for "a project situated within airport land use compatibility plan boundaries, or, if an airport land use compatibility plan has not been adopted, for a project within two nautical miles within an airport . . . ." (Pub. Res. Code, § 21096, subd. (a).) It provides in relevant part, "A lead agency shall not adopt a negative declaration for [such a] project. . . unless the lead agency considers whether the project will result in *a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area*." (Cal. Pub. Res. Code, § 21096, subd. (b), italics added.) The Receptor Thresholds concern air quality and emissions rather than safety hazards or noise problems, and would not appear germane to an analysis of an airport project under this section. District does not argue otherwise.

added; 21159.22, (b)(3) [agricultural housing for employees]; 21159.23, subd. (a)(2)(A) [low income housing]; 21159.24, subd. (a)(1) & (3) [urban infill projects].) "If a potential for exposure to significant hazards from surrounding properties or activities is found to exist, the effects of the potential exposure shall be mitigated to a level of insignificance in compliance with state and federal requirements." (Cal. Pub. Res. Code, § 21159.21, subd. (f)(2).) Transit priority projects are treated similarly. (Pub. Res. Code, § 21155.1, subd. (a)(4), (a)(4)(B).)

The Supreme Court in *Building Association* recognized these CEQA exemption statutes were exceptions to the general rule that CEQA did not require an evaluation of existing hazards on future users of a proposed project. (*Building Association*, *supra*, 62 Cal.4th at p. 391.) "[T]hese statutes reflect an express legislative directive to consider whether existing environmental conditions might harm those who intended to occupy a project site." (*Ibid*.) A lead agency charged with CEQA review of a project governed by these statutes could apply the Receptor Thresholds to determine whether air quality posed a health risk to future occupants of a qualifying housing project.

Citing *Parker Shattuck*, *supra*, 222 Cal.App.4th at page 781, CBIA argues that future occupants of a housing project that is potentially eligible for an exemption are not part of the "environment" for CEQA purposes. This mischaracterizes the issue, which is not whether such future occupants are, in general, a part of the environment, but whether the statues at issue create an exception to the general rule that CEQA does not require an assessment of the environment's effect on a project. The court in *Parker Shattuck* concluded an EIR was not required for a project on a site with toxic soil contamination absent evidence the environment would be changed by a disturbance of the soil; although the project was not categorically exempt from CEQA review, "whether a project should be categorically exempt from CEQA is different from whether the project involves a significant effect on the environment." (*Parker Shattuck*, *supra*, 222 Cal.App.4th at p. 781.) Here, we are concerned not with the need for an EIR on a specific project, but with whether the significance levels set forth in the Receptor Thresholds may be used to

18

evaluate whether a housing project was exempt from CEQA review. Consistent with the reasoning in *Building Association*, they may be used for this purpose.

        5. <u>Planning Decisions</u>

District submits the Receptor Thresholds may be used to determine whether a particular project is consistent with a general plan. A project's inconsistency with a general plan does not itself mandate a finding the project will have a significant effect on the environment (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1207), and we can only speculate as to the ways in which the Receptor Thresholds might be applied when assessing plan consistency. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 172–174 [issue of whether certain CEQA guidelines were valid was not a ripe controversy for purposes of declaratory relief because parties were inviting the court "to speculate as to the type of developments for which access conditions might be imposed, and then to express an opinion on the validity and proper scope of such hypothetical exactions" and it was "sheer guesswork to conclude that the Commission will abuse its authority by imposing impermissible conditions on any permits required"].) While we do not rule out the possibility that the Receptor Thresholds might be used by an agency for such a purpose, District has not provided us with a concrete example of such a use and we do not rely on this hypothetical purpose in deciding, as we discuss below, that the Receptor Thresholds are not invalid on their face.

    E. *Conclusion and Remedy*

We have concluded a local agency might permissibly apply the measurements contained in the Receptor Thresholds to an environmental review conducted under CEQA in certain cases, even though the Receptor Thresholds cannot be used to require an EIR or the implementation of mitigating measures based solely on the impact the existing environment will have on future users or occupants of a project. CBIA argues that notwithstanding these permissible uses, the Receptor Guidelines must be set aside in their entirety because the District did not adopt them for the reasons now articulated.

19

District, on the other hand, urges us to leave the Receptor Thresholds in place so they can be utilized when appropriate.

The Receptor Thresholds are simply numbers indicating when a project will ordinarily pose a risk to human health that will be deemed environmentally significant for CEQA purposes. CEQA requires or allows such an analysis with respect to the receptors of certain projects at various junctures in the environmental review process, but does not require such an analysis in other contexts. The Receptor Thresholds may be used by lead agencies to the extent permissible under CEQA, but any effort by an agency to require an EIR, mitigating measures, or other CEQA review under the Receptor Thresholds when one is not authorized would be subject to a strong legal challenge.

Because the Receptor Thresholds themselves may be used under certain circumstances consistent with CEQA, they are not "clearly erroneous and unauthorized" (*Building Association*, *supra*, 62 Cal.4th at p. 390) and need not be set aside in their entirety. However, the District Guidelines are misleading to the extent they contemplate an application of the Receptor Thresholds to evaluate the effect of the existing environment on all new receptors as a matter of course, a use that would be inconsistent with CEQA as interpreted by the Supreme Court in *Building Association*, *supra*, 62 Cal.4th 369.

We will remand the case to the trial court with instructions to partially grant CBIA's petition for writ of mandate, and issue an order invalidating those portions of the District Guidelines suggesting that lead agencies should apply the Receptor Thresholds to routinely assess the effect of existing environmental conditions on future users or occupants of a project. The trial court may also consider and determine in the first instance the extent to which CBIA may be entitled to declaratory relief regarding the Receptor Thresholds and the limits to be placed upon their use. (Code Civ. Proc., § 1060.)

F. *Attorney Fees*

After the trial court initially entered judgment in favor of CBIA and granted its petition for writ of mandate directing District to set aside is approval of the Thresholds, it

20

awarded CBIA attorney fees under Code of Civil Procedure section 1021.5. Under that statute, which codifies the private attorney general doctrine, attorney fees are available "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one pubic entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Although we reversed the initial judgment in CBIA's favor and accordingly reversed the trial court's award of attorney fees, CBIA has now prevailed in part on one of the issues it raised in this proceeding. Partially successful plaintiffs may recover attorney fees under Code of Civil Procedure section 1021.5. (*Lyons v. Chinese Hospital Assn* (2006) 136 Cal.App.4th 1331, 1345.)

We agree with CBIA that its claim for attorney fees under Code of Civil Procedure section 1021.5 should be considered by the trial court in the first instance. (*Arden Carmichael, Inc. v. County of Sacramento* (2000) 79 Cal.App.4th 1070, 1079–1080 ["Whether a party is entitled to an award of attorney fees under the private attorney general statute is an issue best decided in the first instance by the trial court"]. The trial court should determine CBIA's entitlement to attorney fees on appeal and the amount of any such fees (including fees for proceedings in the Supreme Court), in addition to the fees it awards, if any, for the litigation in the trial court. (See *Bjornestad v. Hulse* (1991) 229 Cal.App.3d 1568, 1598–1599.)[4]

---

[4]     CBIA's request for judicial notice, filed April 22, 2016, is denied as unnecessary to our analysis. District's request for judicial notice filed on May 6, 2016, in support of its opposition to CBIA's request for judicial notice, is denied as moot.

DISPOSITION

The trial court's judgment entered on March 12, 2012, which granted CBIA's petition for writ of mandate and directed District to set aside its approval of the Thresholds in their entirety, is reversed, consistent with our prior opinion in this case. The case is remanded to the trial court for further action consistent with this opinion and the Supreme Court's decision in *Building Association*, *supra*, 62 Cal.4th 369, including but not limited to the issuance of an order partially granting CBIA's petition for writ of mandate. The trial court shall also consider CBIA's request for attorney fees under Code of Civil Procedure section 1021.5 in light of the proceedings in the trial court and on appeal. The parties shall bear their own costs on this appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.

(A135335, A136212)

23

Superior Court of Alameda County, No. RG10-548693, Frank Roesch, Judge.

Shute, Mihaly & Weinberger, Ellison Folk, Erin B. Chalmers and Brian C. Bunger for Defendant and Appellant.

Ruby R. Fernandez for South Coast Air Quality District as Amicus Curiae on behalf of Defendant and Appellant.

Paula A. Forbis for County of San Diego as Amicus Curiae on behalf of Defendant and Appellant.

Matthew D. Vespa for Sierra Club and Center for Biological Diversity as Amicus Curiae on behalf of Defendant and Appellant.

Burke, Williams & Sorensen and Thomas B. Brown for League of California Cities and California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

Cox, Castle & Nicholson, Andrew B. Sabey, Christian Cebrian, Michael H. Zischke and Bradley B. Brownlow for Plaintiff and Respondent.

Perkins Coie and Geoffrey L. Robinson for Center for Creative Land Recycling as Amicus Curiae on behalf Plaintiff and Respondent.

24